**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Erik D. ERSKINE, Defendant–Appellant.**

**No. 02–50030.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 2003.

Filed Jan. 21, 2004.

---

**1162**

Robinson D. Harley, Jr., Santa Ana, CA, for the defendant-appellant.

Jerry A. Behnke, Assistant United States Attorney, Riverside, CA, for the plaintiff-appellee.

---

1. Security camera tapes from this date show Erskine slipping a white piece of paper under the door. The note read:

THIS REPORT IS TO INFORM YOU THAT CERTIN PEOPLE HAVE UNCOVERED

Presiding, D.C. No. CR–00–00806–RMT–01.

Before REINHARDT, O'SCANNLAIN, and FISHER, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge.

Erik Erskine appeals his conviction on one count of threatening to assault or murder FBI agents, in violation of 18 U.S.C. § 115(a)(1)(B). Erskine contends that the district court erred in finding a knowing and voluntary waiver of counsel and allowing him to represent himself in accordance with *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). We hold that Erskine's waiver of his Sixth Amendment right was invalid because the court failed to advise him correctly at the *Faretta* hearing of the possible penalties he faced, and the record does not show that he had an accurate understanding of the potential consequences at the time he agreed to waive that right. Accordingly, we REVERSE and REMAND.

## I. BACKGROUND

### A. Factual Background

In 1999, appellant Erik Erskine began contacting FBI agents in Santa Maria, California, and other government agencies, under the apparent belief that the FBI had been corrupted and his life placed in danger because of this knowledge.

On July 11, 2000, Erskine left a message on the Santa Maria FBI office voice mail stating that he knew people who were threatening to kill FBI officers. Ten days later, on July 21, 2000, Erskine left a typewritten note under the door of the office.[1] Finally, on February 26, 2001, an

YOUR TRUE NAMES AND ADDRESS MR *DANIAL* PAYNE—*JONTHIN* ZELINSKI *EDWARD* J MILLER. CERTIN CRUPT GOVERMENT AGENTS HAVE BEN IN-PERSONATING YOU AND HAVE RAPED

agent of the Los Angeles FBI received a threatening voice mail from the phone number registered to Erskine's address.[2]

### B. Procedural Background

A federal grand jury returned a two count indictment against Erskine charging violations of 18 U.S.C. § 115(a)(1)(B).[3] Count one related to the July 11, 2000 incident (the voicemail message left at the Santa Maria office), and count two related to the July 21, 2000 incident (the note left at the Santa Maria office). The government filed a motion requesting a hearing to determine whether Erskine was competent to stand trial. The district court found that he was. A jury then found Erskine, represented by Deputy Federal Public Defender Derek Li, not guilty on count 1. It was unable to reach a verdict on count two and the district court declared a mistrial on that count.

Erskine then asked that he be permitted to represent himself, and that a new attorney be appointed as standby counsel. The district court engaged him in a lengthy colloquy about the dangers and disadvantages of self-representation.[4] Near the

---

AND MOLISTED MOFA MEMBERS CHILDREN< I AM REPORTING THIS TO YOU BECOSE I HAVE DONE ALL I CAN DO TO PROTECT YOU. LA F.B.I. HAS REFUSED TO ASSIST IN APPERHINDING THESE MAFA MEMBERS YOU PLAN TO MAKE AN EXAMPLE OUT OF YOU AND YOUR FAMLY IF NESSARY. I KNOW WHO THEY ARE AND HAVE RECORDED THIER ORDERS WHEN I WAS TALKING TO THEM IN REGARDS TO WHAT I HAVE UNCOVERED. I BELIEVE THAT YOU HAVE ALL BEN INVOLVED IN CERTAIN ACCIVITIVITYS THAT ARE QUISTINABLE AT THE VERY LEAST< BUT I DO NOT AGREE WITH MURDER LA F.B.I. WAS INFORMED THAT I WAS WILLING TO TURN OVER TAPED EVIDANCE BUT HAS REFUSED TO CONTACT ME I AM CONCERNED FOR YOU AND YOUR FAMLYS SAFTY.
YOUR ADDRESS WERE LOOKED UP USING THE COUNTY COMPUTER AT THE TAX ASSORS OFFICE. ALONG WITH YOUR FAMLY'S WHO LIVE IN THE COUNTY.
ONCE AGIN I ERIK DAVID ERSKINE DO NOT WANT YOU TO BE PHYSICALY HARMED BUT SOME OF THE PEOPLE I WORK FOR DONT AGREE. DAN I MAY NOT LIKE WHAT YOU DID BUT I DON'T WANT YOU KILLED.

2. The message stated the following:
   I apologize, like I said, my name is (unintelligible). And the reason why I called in is because I just wanted to tell (unintelligible) you people I witnessed Daniel Payne or Dan Payne, something like that. I looked up his address at the county auditor's office. He's an FBI agent, works there right?

Well, I saw that man rape and molest a little girl. And I'm telling you people, if you don't turn around and arrest the son of a bitch, I'm gonna take a goddamned shotgun and I'm gonna shove it clean up his asshole, and I'm gonna pull both goddamned barrels. Do you understand?

3. The statute provides in relevant part:
   (a)(1) Whoever—
   ...
   (B) threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section, with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b).

4. The Court: Now there's an old but very true legal adage. One who represents himself has a fool for a client. I'm sure you've heard that before. As I indicated before, you are charged with a serious crime, and the court feels it's a gross mistake on your part to reject the services of your counsel and to represent yourself. However, under the law, you have a right to represent yourself provide that you convince this court that you knowingly and intelligently waive your constitutional right to counsel.

   Please understand that you are going to be up against an experienced lawyer, and

end of this exchange, the court specifically inquired whether Erskine understood the possible penalties that he faced. When Erskine responded in the affirmative with an incorrect statement of the maximum penalty, the court failed to correct his mis-

understanding and instead assented to his erroneous response:

The Court: All right. With respect to the possible sentences, do you know what that is?

you realize that the prosecutor is not going to be out there to help you.

The defendant: From his actions, I'm well aware of that.

The Court: The objective of the prosecutor, of course, is to seek a conviction. You are aware of that?

The defendant: Unfortunately, whether it's just or not.

. . .

The Court: The charges are that you threatened to assault or murder a federal law enforcement officer, that you did so with the intent to retaliate against that officer, and you did so on account of the performance of the officers' official duties.

You are aware of those charges, are you not?

The defendant: Yes, your Honor.

The Court: Let's talk in terms of the rules of evidence, objections to evidence that may not be admissible.

The defendant: For the most part, it would be hearsay.

The Court: What type of training do you have in that respect?

The defendant: Not a whole lot, your Honor. I admit that when it comes down to it, I'm pretty much a layman. I feel that the ladies and gentlemen of the jury will see the government's intent. If the government presents or manipulates a witness, I believe that—the ladies and gentlemen of the jury, they're not trained specialists to question people, but they get a good feel of what people's intent is. . . .

The Court: You realize as an attorney that you cannot testify—

The defendant: I'm well aware, your honor.

The Court:—While you're at the podium.

The defendant:—Yes, your honor.

The Court: You have to call yourself as a witness; do you understand that?

The defendant: Yes, your honor.

The Court: And—

The defendant: I'm sorry, can you reiterate that, that I can't testify.

The Court: You may testify, but you can't testify at the podium. I mean you can't load up your questions.

The defendant: Yes, yes, your Honor. It would have to be straight-across questions.

The Court: Let's talk about the trial itself. With respect to questions to be asked of jurors, I may permit both sides to ask—to pose questions to the jurors during the selection process. You will have to know what questions to ask, how to ask it, and you will have to know when and how to exercise peremptory challenges for cause or peremptory challenges; do you understand that?

The defendant: Yes, your Honor. . . .

. . .

The Court: With respect to questions that are posed by the prosecutor, if you wish to make objections, they have to be proper in form. I, of course, will allow you to consult with your standby counsel as long as it doesn't unduly delay the proceedings. . . .

. . .

The Court: If you don't ask the questions properly, an objection could be sustained, and that's the end of that.

The defendant: Yes, your honor.

The Court: Unless you phrase your questions in such a way that it's acceptable.

The defendant: Yes, your honor.

. . .

The Court: All right. Let's suppose that you represent yourself, proceed to trial, and that you were convicted. One of the possible grounds for appeal is the kind of defense you received. You can't on appeal indicate that, as you represented yourself, that you were represented by ineffective counsel. You realize that?

The defendant: Yes, your honor.

. . .

[The Court] . . . You realize that my advice to you is that you should be represented by counsel?

The defendant: Yes, your Honor.

The Court: Having heard that, it is still your opinion that you wish to represent yourself; is that correct?

The defendant: Yes, your honor.

The defendant: The maximum is listed through the guidelines, *one year*, even though the sentencing guidelines for my charge—

The Court: How many counts are against you?

The defendant: *One, sir. Maximum amount is one year.* My sentencing guidelines, though, is zero to six months because of my offense level. The government has it listed as a 3, but technically it's a 6.

The Court: *All right . . . .*

(emphasis added). Following this colloquy, the district court found that Erskine had knowingly, intelligently, and voluntarily waived his right to counsel, and appointed Li as standby counsel.[5] Unfortunately, the statutory maximum was actually five years, not one. *See* 18 U.S.C. § 115(b)(4) (1999).

The government's trial memorandum for the first trial also misstated the maximum penalty—in that case, as three years. It was only well *after* the *Faretta* hearing (at which the government was not present), on the first day of the second trial, that the government sought to correct its error:

Mr. Benke: . . . And, also, I just wanted to point out that, although we did not file an amended or supplemental trial memorandum, the original trial memorandum and the section related to the possible penalties in this case was in error. The trial memorandum from the first trial stated that the maximum possible penalty I believe was one year imprisonment—a maximum of three years.

*The correct maximum penalty in this case, pursuant to section 115(b)(4) is a maximum of five years of imprisonment,* and I just wanted to make sure that everybody was on the same page, especially since Mr. Erskine is representing himself in this case.

(emphasis added). Despite a revelation that quintupled the stakes of self-representation for Erskine, the court did not acknowledge its prior mistake, address Erskine to ascertain whether he had understood the government's representation, advise him of the correct maximum penalty, or ask him whether in light of the new and different information as to the penalty he faced, he desired to withdraw his *Faretta* waiver. Instead, the court simply stated: "All right. Thank you very much. Mr. Cruz, will you please arraign Mr. Erskine?" After a three day trial, the jury returned a guilty verdict on count two of the superseding indictment, but was again unable to reach a verdict regarding the July 11, 2000 incident (the first count).

In fact, Erskine appears not to have been aware of the maximum penalty at the time the government sought to correct its earlier error, or at any point prior to or during either jury trial. Nor, it appears, was he aware of the maximum sentence even at the time of sentencing, when he once again revealed a misunderstanding about the possible penalty he faced.[6] In

---

5. Subsequently, a federal grand jury returned a superseding two count indictment against Erskine, charging violations of 18 U.S.C. § 115(a)(1)(B). Count one related to the same offense previously charged in count two of the original indictment. Count two related to the February 26, 2001 incident (the voicemail message left at the Los Angeles FBI office). Thus, the correct maximum penalty for each violation remained the same as it had been for the single count at the time of the *Faretta* hearing: five years. *See* 18 U.S.C. § 115(b)(4). For purposes of our decision, we need not consider the effect, if any, of adding a count following a *Faretta* hearing that results in self-representation.

6. At the time of sentencing, Erskine stated:

[M]y issue is, is of the point scale in which the government tried to give me a level 21 which would put me in prison 41 to 51 months and how come they've come up with this. Maximum criminal statute only goes to three years. *They're coming up with four to five years. It makes no sense, you know, to me.*

the end, the court sentenced Erskine to a prison term that was more than twice the length that it had allowed him to believe was the maximum at the time of the *Faretta* waiver.[7] Erskine appeals on the ground that the waiver of his Sixth Amendment right to counsel was not valid.[8]

## II. STANDARD OF REVIEW

■ We review the validity of a *Faretta* waiver, a mixed question of law and fact, de novo. *United States v. Lopez–Osuna*, 232 F.3d 657, 663–64 (9th Cir.2000).

Citing *United States v. Vonn*, 535 U.S. 55, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002), however, the government urges us to apply the plain error standard to our review here, arguing that because Erskine let the *Faretta* error pass without objection, he must show that, had be been advised of the correct penalties during the *Faretta* colloquy, he would not have elected to represent himself. We reject the government's position as contrary to logic and the force of our precedent.[9]

In *Vonn*, the Court considered "whether Congress's importation of the harmless-error standard into Rule 11(h) without its companion plain-error rule was meant to eliminate a silent defendant's burdens under the Rule 52(b) plain-error review, and

instead give him a right to subject the Government to the burden of demonstrating harmlessness." *Id.* at 63, 122 S.Ct. 1043. Answering this question in the negative, the Court went on to note in a footnote that "an uncounseled defendant may not, in fact, know enough to spot a Rule 11 error, but when a defendant chooses self-representation *after* a warning from the court of the perils this entails, Rule 11 silence is one of the perils he assumes." *Id.* at 73 n. 10, 122 S.Ct. 1043 (internal citations omitted) (emphasis added).

■ The Court's reasoning in *Vonn*, however tautological, is inapposite where a defendant has not yet been adequately informed of all the elements that he must take into account in making his decision to forgo counsel and where the error in question involves the failure to provide him with that information. Our requirements for reviewing the validity of a *Faretta* waiver are predicated on the fact that we do not expect pro se defendants to know the perils of self-representation, and consequently, we cannot expect defendants to recognize that they have not been correctly and fully advised, let alone to point out the court's errors. Accordingly, plain error review would be inappropriate, and we

(emphasis added).

7. Erskine was sentenced to a prison term of 27 months, to be followed by 3 years supervised release and a fine of $100.00.

8. Alternatively, Erskine asserts that the court's appointment of advisory counsel was directly contrary to *Faretta*. Erskine also argues that the district court erred in admitting evidence of his attempt to purchase a gun pursuant to Fed.R.Evid. 404(b); in failing to find that a 41(d) violation warranted the suppression of evidence; and in refusing to grant him a downward adjustment for acceptance of responsibility. Because we hold that Erskine's waiver was not knowing and intelligent, we need not reach the separate issues

raised. We should note, however, that we are aware of nothing in *Faretta* or any subsequent case that would suggest that the appointment of advisory counsel is prohibited.

9. We also note that the government itself begins by citing *Lopez–Osuna* for the standard of review we typically apply. In that case, we reviewed de novo the validity of a defendant's *Faretta* waiver without any mention of an objection made by the defendant before the district court. Accordingly, the government's own authority cited in the pertinent section of its brief undercuts its argument that the plain error standard applies in cases in which a defendant fails to object below to a failure to inform him of the information called for by the *Faretta* requirements, *see infra* Part III(A).

instead perform the simple de novo review in which we have customarily engaged. *See, e.g., Lopez v. Thompson,* 202 F.3d 1110, 1116 (9th Cir.2000) (en banc); *United States v. Robinson,* 913 F.2d 712, 714 (9th Cir.1990); *Harding v. Lewis,* 834 F.2d 853, 857 (9th Cir.1987); *see also United States v. Balough,* 820 F.2d 1485 (9th Cir. 1987) (en banc); *United States v. Harris,* 683 F.2d 322 (9th Cir.1982); *United States v. Kimmel,* 672 F.2d 720 (9th Cir.1982); *United States v. Bird,* 621 F.2d 989 (9th Cir.1980); *United States v. Aponte,* 591 F.2d 1247 (9th Cir.1978).

■ Moreover, the failure to meet the requirements for a valid *Faretta* waiver constitutes per se prejudicial error, and the harmless error standard is inapplicable. *See Balough,* 820 F.2d at 1489–90; *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis."); *U.S. v. Arlt,* 41 F.3d 516, 524 (9th Cir.1994) (stating that a denial of the right to self-representation is " 'per se prejudicial error' "). Accordingly, our determination that a *Faretta* error occurred here requires us to reverse the conviction.

## III.  DISCUSSION

### A.  Sixth Amendment Violation

Erskine contends that because the court failed to advise him of the possible penalties he would face if convicted, he did not knowingly and intelligently waive his right to counsel.

The Constitution guarantees every defendant the paramount right to a fair and reliable trial. In contrast to this Fifth Amendment right, the Sixth Amendment guarantees a defendant a right to counsel but also allows him to waive this right and to represent himself *without* counsel.

*Faretta v. California,* 422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Like the other procedural guarantees of the Sixth Amendment, the primary purpose of the right to self-representation is to achieve the substantive objective of a fair trial. To this end, we have consistently emphasized the primacy of the district court's role in protecting a defendant's twin Fifth and Sixth Amendment rights by insuring that a *Faretta* waiver is knowing and intelligent, *see United States v. Hernandez,* 203 F.3d 614, 625 n. 16 (9th Cir. 2000) (discussing this "fundamental obligation"), and we cannot overstate the importance of the court's responsibility in this respect. *See United States v. Farhad,* 190 F.3d 1097, 1102 (9th Cir.1999) (Reinhardt, J., specially concurring) (questioning the wisdom of *Faretta,* as it has developed in the courts, and discussing the difficulty inherent in preserving both rights simultaneously).

■ A defendant's decision to forgo counsel and instead to defend himself— known as a "*Faretta* waiver"—is valid if the request is timely, not for the purposes of delay, unequivocal, and knowing and intelligent. *Arlt,* 41 F.3d at 519. In order to deem a defendant's *Faretta* waiver knowing and intelligent, the district court must insure that he understands 1) the nature of the charges against him, 2) the possible penalties, and 3) the "dangers and disadvantages of self-representation." *Balough,* 820 F.2d at 1487. On appeal, the government carries the burden of establishing the legality of the waiver, *United States v. Mohawk,* 20 F.3d 1480, 1484 (9th Cir.1994), and this court evaluates the question with great care, indulging "every reasonable presumption against waiver." *Arlt,* 41 F.3d at 520 (quoting *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). Only the second

and third elements identified in *Balough* are at issue here.

### 1. Knowing and Intelligent Waiver

We have advanced · different formulations for determining whether a defendant's waiver of his right to counsel is knowing and intelligent.[10] While we have never required district courts to recite a particular script when making their inquiry, *United States v. Keen,* 104 F.3d 1111, 1114 (9th Cir.1996), each formulation recognizes that a careful assessment is essential to protecting concurrent Fifth and Sixth Amendment rights. The three *Balough* elements establish preconditions for accepting the request in the context of different formulations. *Hernandez,* 203 F.3d at 623.

### a. Dangers and Disadvantages· of Self–Representation

We have suggested model language regarding the "dangers and disadvantages" demands:

> The court will now tell you about some of the dangers and disadvantages of representing yourself. You will have to abide by the same rules in court as lawyers do. Even if you make mistakes, you will be given no special privileges or benefits, and the judge will not help you. The government is represented by a trained, skilled prosecutor who is experienced in criminal law and court procedures.. Unlike the prosecutor you will face in this case, you will be exposed to the dangers and disadvantages of not knowing the complexities of jury selection, what constitutes a permissible opening statement to the jury, what is admissible· evidence, what is appropriate

direct and cross examination of witnesses, what motions you must make and when to make them during the trial to permit you to make post-trial motions and protect your rights on appeal, and what constitutes appropriate closing argument to the jury.

*United States v. Hayes,* 231 F.3d 1132, 1138–39 (9th Cir.2000).

■ In the case before us, the district court engaged in a lengthy colloquy with Erskine after he sought the right to proceed pro se. *See supra* note 4. While the exchange was not as precise and structured as the language of *Hayes,* the court's explorations properly covered the key points raised in the model passage. The district judge explained the seriousness of the charges Erskine faced; he specifically ascertained whether Erskine understood that he would be expected to abide by the same complex rules as an experienced attorney; he reviewed with Erskine in broad terms the rules regarding the admission of evidence, jury selection, objections to the form of questions,.and grounds for appeal; and he repeatedly emphasized the importance of counsel. Moreover, the district court's inquiry was· comparable to that conducted in other cases in which this court has found that a defendant was adequately warned of the dangers and disadvantages of self-representation. *See Lopez,* 202 F.3d at 1118; *Farhad,* 190 F.3d at 1100; *Arlt,* 41 F.3d .at 521. This is not a case in which the district court simply suggested that there might be abstract consequences resulting from the lack of representation by counsel without describing those consequences with specificity. *Cf. Hayes,* 231 F.3d at 1137 (holding that

---

**10.** Although the test is generally stated as requiring that the waiver must be "knowing and intelligent," in other formulations, it is "knowing, intelligent, and voluntary." Regardless of the precise formulation, the requirements for accepting a defendant's waiver under *Balough* are the same, and voluntariness is often an unstated or assumed prerequisite.

defendant had not been made aware of dangers of self-representation where the court's dialogue lacked specificity). Accordingly, here we conclude that the district court conducted an assiduous inquiry that communicated fully to Erskine the dangers and disadvantages of self-representation. Regarding this element of *Balough*, Erskine "kn[ew] what he [wa]s doing," and his decision was "made with eyes open." *See Faretta*, 422 U.S. at 835, 95 S.Ct. 2525.

#### b. *Possible Penalties.*

Although we hold that Erskine was adequately warned of the disadvantages of self-representation, his *Faretta* waiver is valid only if the court also ascertained that he understood the possible penalties he faced. Erskine argues that because the district court failed to correct the misunderstanding of the possible penalty that he expressed during the *Faretta* hearing and, to the contrary, assented to his erroneous statement, the purported waiver was invalid. The government concedes that Erskine was misadvised of the possible penalty but nonetheless contends that the record as a whole shows that the waiver was valid.

"Ordinarily, we simply would review the answers given by a defendant in his or her colloquy with the court to evaluate whether the decision to waive counsel was knowing and intelligent." *Mohawk*, 20 F.3d at 1484. As a rule, the court's failure to determine that a waiver was knowing and intelligent according to the *Balough* factors "is conclusive and requires automatic reversal of a defendant's conviction." *Id.* Nevertheless, we have held that "a limited exception may exist whereby a district court's failure to discuss each of the elements in open court will not necessitate automatic reversal when the record as a whole reveals a knowing and intelligent waiver." *Balough*, 820 F.2d at 1488 (citing *Kimmel*, 672 F.2d at 722). "Our cases

have consistently held, however, that this 'limited exception [is] to be applied in rare cases.'" *Id.* (quoting *Harris*, 683 F.2d at 324). This is not such a case.

■ The government asserts that, notwithstanding the district court's erroneous advice at the time of the *Faretta* hearing, Erskine's comments at the time of sentencing reveal that he was at least aware that he faced a three year maximum penalty, and that the sentence he actually received was less than three years. While we agree with the government that the "appropriate inquiry is what the defendant understood—not what the court said or understood," *see, e.g., Balough*, 820 F.2d at 1487–88; *Harris*, 683 F.2d at 325; *Kimmel*, 672 F.2d at 722, the absence of a temporal focus for the government's inquiry helps lead it to an erroneous conclusion on the merits. The question even in the rare case envisioned by *Balough* is not, broadly, what the record reveals about Erskine's understanding of the possible penalty throughout the different stages of the proceedings—pre-trial, trial, and sentencing—but specifically what the defendant understood *at the particular stage of the proceedings at which he purportedly waived his right to counsel. See Balough*, 820 F.2d at 1489 (reviewing the record and formulating the operative inquiry as whether the evidence "show[ed] that Balough understood the dangers and disadvantages of self-representation *at the time* he sought to waive his right to counsel") (emphasis added); *Aponte*, 591 F.2d at 1250 ("The manner in which a defendant conducts his defense cannot establish his state of mind *at the time* he opted for self-representation.") (emphasis added); *U.S. v. Dujanovic*, 486 F.2d 182, 186 (9th Cir. 1973) (noting that the "keystone determination" in the waiver inquiry is the "state

of mind of the accused or information at hand upon which he *at that time* intelligently waived his constitutional right of counsel") (emphasis added); *cf. Vonn*, 535 U.S. at 74–76, 122 S.Ct. 1043 (concluding that, when examining an alleged Rule 11 violation, an appellate court can look to the entire record to determine a "defendant's understanding *when pleading guilty*" although the "best evidence" of this understanding "is the colloquy closest to the moment he enters the plea") (emphasis added).

Accordingly, although we may examine Erskine's statements at the sentencing hearing subsequent to the time of his waiver, we may do so only insofar as such statements bear on the specific question of what Erskine understood at the time he purportedly waived his right to counsel. For example, had Erskine admitted, at the time of sentencing, that he had known the maximum penalty all along, this evidence would be relevant to our determination because it would shed light on the state of his understanding at the time of the prior *Faretta* hearing.[11] In contrast, the broad inquiry into the defendant's state of mind urged by the government tells us nothing about what Erskine understood *at the time of his waiver*; rather, Erskine's statements at the sentencing hearing reveal only that, *at the time of sentencing*, he believed that the maximum penalty was three years.[12] The latter is not relevant to our resolution of the question presented to us when we review the validity of a *Faretta* waiver. Rather, only a specific inquiry into the status of the defendant's knowledge and understanding at the time of the purported waiver will allow us to determine whether Erskine opted to forgo counsel "with eyes open," *see Faretta*, 422 U.S. at 835, 95 S.Ct. 2525, and thus, to decide whether his waiver was in fact knowing

---

**11.** We do note, however, that in the few cases in which evidence outside the *Faretta* colloquy may reveal a valid waiver, it is only rarely that evidence *subsequent* to the time of waiver will bear on the question of a defendant's understanding at the time he decides to forgo counsel. *See, e.g., Aponte*, 591 F.2d at 1250 ("The manner in which a defendant conducts his defense cannot establish his state of mind at the time he opted for self-representation."). More often, in these "limited exception[s]" to the rule of automatic reversal, *see Balough*, 820 F.2d at 1488, it will be evidence *prior* to the time of waiver that pertains to our determination "because there are circumstances in which defendants may be presumed to recall information provided to them prior to the[] [*Faretta*] proceeding." *Vonn*, 535 U.S. at 75, 122 S.Ct. 1043.

**12.** Moreover, the government's argument that Erskine's statements at sentencing bear on the validity of his *Faretta* waiver because he was subsequently sentenced to less than what he erroneously believed to be the maximum at sentencing is incorrect for an additional reason: the argument misperceives the nature of the harm a defendant suffers when his decision to represent himself is not knowing and intelligent. The government asserts the view that a waiver is knowing and intelligent as long as the record reveals that the penalty ultimately imposed does not exceed the penalty the defendant erroneously believed to be the maximum that could be imposed. Under the government's view, in such a case it does not matter that the maximum statutory penalty exceeds by many times the penalty that a defendant believes to be the maximum. In short, the government is arguing that the error was harmless. As we explained earlier, however, *supra* Part II, *Faretta* error is not subject to the harmless error rule. The reason is that the prejudice a defendant suffers is not in the *term of his sentence* but rather in the *decision to forgo counsel* and, instead, to represent himself. The choice of self-representation, in turn, increases the likelihood of a conviction and likely length of any sentence. *See McKaskle*, 465 U.S. at 177 n. 8, 104 S.Ct. 944. It is the court's failure to inform the defendant of the correct maximum penalty that affects this *decision* which, in turn, gives rise to the harm and to the per se prejudice. *See Arlt*, 41 F.3d at 524.

and intelligent when it was made. *See Lopez*, 202 F.3d at 1119 (explaining, "We heed the Supreme Court's teaching that our waiver analysis must be pragmatic and directed to *the particular stage* of the proceedings in question.") (emphasis added) (internal quotation marks omitted).[13]

The government urges that we consider the prosecutor's statement as to the maximum penalty made on the first day of the second trial, arguing that we relied on a statement made at a comparable time in *Lopez–Osuna*, 232 F.3d at 657. In that case, however, we relied principally on discussions between the defendant and the court held prior to the *Faretta* hearing and, on the basis of these discussions we concluded that "Lopez clearly understood" the charges. *Id.* at 664. Although we noted subsequently, "[m]oreover, . . . after Lopez officially declared that he would represent himself," the district court offered a further explanation as to the elements of the offense on the day before trial, *id.*, our statement was directed primarily at Lopez's contention that his answers during that colloquy showed that he did not understand the nature of the charges even as of the time of trial, a contention we firmly rejected. Thus, *Lopez–Osuna* in no way supports the government's argument that the information as to the penalty provided by the prosecution long after Erskine's purported *Faretta* waiver is sufficient to meet the *Faretta* requirements.

In sum, we conclude that Erskine did not understand the possible punishment he faced at the time he opted to forgo counsel, and thus did not intelligently and voluntarily waive his Sixth Amendment right. Regarding this element of *Balough*, defendant did not know "what he [wa]s doing," and his decision was not "made with eyes open." *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525.

## CONCLUSION

For the forgoing reasons, we hold that Erskine's waiver of his Sixth Amendment right was not valid. Although the court carefully and thoroughly discussed with Erskine the dangers and disadvantages of self-representation, it failed to similarly ensure that he understood the possible penalties he faced. As a result, the evidence in the record does not reveal that Erskine understood the possible penalty he faced at the time of his *Faretta* waiver. In fact, the record reveals that Erskine did *not* understand these consequences when he opted for self-representation. Accordingly, we conclude that Erskine's Sixth Amendment rights were violated, and that he is entitled to a new trial.

**REVERSED and REMANDED.**

---

**13.** Where, as here, the district court provides erroneous advice to the defendant at the time of the *Faretta* hearing, any prior knowledge or understanding the defendant may have had becomes irrelevant because a reasonable defendant would rely on the court's instruction and would weigh the decision to forgo or retain counsel on the basis of the information (faulty or not) provided by the court.