IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37538-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JEREMEY DOUGLAS PEDERSEN, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Jeremy Pedersen appeals his conviction for first degree child rape. We affirm the conviction but remand for resentencing.

FACTS

In 2018, 12-year-old N.R. told her grandmother she had been molested six years earlier by her mother's boyfriend, Jeremy Pedersen. The grandmother immediately called N.R.'s mother about the disclosure. N.R.'s mother then contacted law enforcement and Detective Stephen Evitt conducted a forensic interview with N.R. The State charged Mr. Pedersen with one count of first degree child molestation and one count of first degree child rape.

Mr. Pedersen was initially represented by court-appointed counsel. At arraignment, he was informed of the maximum penalties of life in prison and/or a $50,000 fine on both

charges. Together with his court-appointed attorney, Mr. Pedersen reviewed and signed

an acknowledgement of advice of rights that restated the maximum penalty for his

charges.

Subsequent to arraignment, Mr. Pedersen advised the court he wished to represent

himself. Mr. Pedersen indicated he was satisfied with his attorney, but he thought he

could better show the jurors who he was through self-representation. The trial court

engaged Mr. Pedersen in a lengthy colloquy regarding his rights and the dangers and

disadvantages of self-representation. The court advised Mr. Pedersen of the standard

sentencing range he could face upon conviction. The court did not reiterate the statutory

maximum terms of incarceration. The court ended the colloquy by giving Mr. Pedersen

several days to reconsider his request for self-representation. Mr. Pedersen subsequently

confirmed he wished to proceed pro se. The court accepted this position and appointed

Mr. Pedersen's existing attorney as standby counsel.

Prior to trial, the State filed an amended information adding two sentencing

aggravators to each of the charges.[1] The amended information stated the maximum

sentence of life in prison and/or a $50,000 fine. At a hearing, Mr. Pedersen indicated

---

[1] The two aggravators were the particularly vulnerable victim aggravator as defined in RCW 9.94A.535(3)(b), and the position of trust aggravator as defined in RCW 9.94A.535(3)(n).

he reviewed the amended information. At the trial court's request, the State informed

Mr. Pedersen the sentencing aggravators, if found by the jury, allowed the court to

sentence him beyond his standard range.

At trial, the State elicited testimony from N.R., her mother, her grandmother, her

cousin, Detective Evitt, and Jessica Johnson, an expert on sexual abuse. During his case

in chief, Mr. Pedersen elicited testimony from N.R. and Detective Evitt. Mr. Pedersen did

not testify.

The jury found Mr. Pedersen guilty of first degree child rape, but acquitted him of

child molestation. The jury also found the two sentencing aggravators on the child rape

charge.

At sentencing, Mr. Pedersen faced a standard range of 240 to 318 months'

imprisonment. Mr. Pedersen's offender score was based in part on a prior conviction for

possession of controlled substances. The trial court imposed an exceptional sentence of

342 months' imprisonment, which was 24 months above the high end of the standard

range. The court also imposed lifetime community custody and a $500 victim penalty

assessment. The State represented that Mr. Pedersen was indigent and did not ask for

any additional legal financial obligations. Nevertheless, Mr. Pedersen's judgment and

sentence states Mr. Pedersen is required to "pay supervision fees as determined by DOC

[Department of Corrections]" while on community custody. Clerk's Papers at 53.

Mr. Pedersen now appeals his conviction and sentence.

ANALYSIS

*Waiver of right to counsel*

Individuals charged with crimes enjoy competing rights to counsel and self-

representation. *State v. James*, 138 Wn. App. 628, 635, 158 P.3d 102 (2007). The default

is the right to counsel. In order for the right to counsel to give way to the right to self-

representation, the trial court must ensure the waiver of counsel is "knowing, voluntary,

and intelligent." *City of Bellevue v. Acrey*, 103 Wn.2d 203, 208-09, 691 P.2d 957 (1984).

There is no set formula for assessing the validity of a waiver of counsel. *James*,

138 Wn. App. at 636. "[A]t a minimum" the defendant should be advised of "the

seriousness of the charge, the possible maximum penalty involved, and the existence of

technical, procedural rules governing the presentation of the accused's defense." *State v.*

*Silva*, 108 Wn. App. 536, 539, 31 P.3d 729 (2001). The ultimate question is whether the

defendant made an informed choice "with eyes open." *Adams v. United States ex rel.*

*McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942). We review a trial

court's decision regarding waiver of the right to counsel for abuse of discretion. *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 667, 260 P.3d 874 (2011).

Mr. Pedersen claims his counsel waiver was invalid because his colloquy with the trial court did not include advice regarding his statutory maximum term of incarceration. We are unpersuaded. While it would have been preferable for the trial court to review the statutory maximum penalty during the counsel-waiver colloquy, this was not required. Mr. Pedersen was advised of the statutory maximum term prior to his counsel waiver, during arraignment and through the advisement of rights form. Nothing in the record suggests Mr. Pedersen did not understand his maximum term of imprisonment. This case is therefore distinct from *State v. Nordstrom*, 89 Wn. App. 737, 744, 950 P.2d 946 (1997), where the defendant was never informed as to the maximum penalty and *United States v. Erskine*, 355 F.3d 1161, 1171 (9th Cir. 2004), where the defendant was misinformed as to the maximum penalty.

Mr. Pedersen also argues the court should have confirmed his desire for self-representation after the State filed amended charges. This is not required by our case law. *See State v. Modica*, 136 Wn. App. 434, 445, 149 P.3d 446 (2006), *aff'd*, 164 Wn.2d 83, 186 P.3d 1062 (2008). Furthermore, the trial court revisited Mr. Pedersen's desire to

represent himself during a February 11, 2020 hearing. This was after the State filed the

amended information but before trial.

Finally, Mr. Pedersen argues his constitutional rights were violated because he

was erroneously advised he would waive his right to testify if he represented himself.

The purported advice came during a CrR 3.5 hearing addressing the admissibility of

Mr. Pedersen's statements to police. The CrR 3.5 hearing took place after Mr. Pedersen

waived his right to counsel. During the hearing, the prosecutor and the court had the

following colloquy:

> THE COURT: Does the State intend to introduce any of those
> statements?
> [THE PROSECUTOR]: Potentially. I don't know—Mr. Pedersen,
> obviously, can't testify on his own behalf, if he's going to be representing
> himself, so he's going to need to—those statements—depending on—I
> don't know. He could change his mind, between now and then, whether or
> not he wants an attorney. I don't know. So the State needs to be prepared
> for everything.
> So there are statements that are offered, that, if he changes his mind,
> day of trial, then I need to be prepared.
> THE COURT: Okay.

1 Report of Proceedings (RP) (May 29, 2019) at 42-43.

The prosecutor clearly misspoke when she said Mr. Pedersen could not testify if he

represented himself. However, Mr. Pedersen has not shown how this comment impacted

any of his rights. During the trial court's colloquies with Mr. Pedersen on self-

representation, the court repeatedly explained Mr. Pedersen had the right to testify, but was not required to do so. The court cautioned Mr. Pedersen that if he represented himself but chose not to testify, he would not get to use closing argument to tell his "side of the story." 1 RP (May 15, 2019) at 19. Mr. Pedersen repeatedly affirmed he understood the trial court's advice. Contrary to the arguments made on appeal, nothing about the trial court's explanation of the right to testify was contradictory or confusing.

Given the totality of the circumstances, Mr. Pedersen validly waived his right to counsel in favor of his right to self-representation.

*Right of self-representation*

Mr. Pedersen argues the trial court undermined his right of self-representation by misadvising him on the admissibility of prior witness statements, unnecessarily limiting the role of standby counsel, and issuing conditions of pretrial release impairing his access to witnesses. We address Mr. Pedersen's arguments in this order.

*Advice on admissibility of prior statements*

Mr. Pedersen claims the trial court erroneously told him he would only be able to admit testimony regarding N.R.'s prior out-of-court statements for impeachment purposes. Mr. Pedersen points out that a witness's prior statements can sometimes be

admitted as substantive evidence, not just impeachment. Thus, he claims the trial court's

advice was faulty.

We disagree the trial court's comments were misleading. In context, it was

apparent Mr. Pedersen was interested in impeaching N.R. with allegedly prior

inconsistent statements. The trial court correctly advised Mr. Pedersen about the limited

admissibility of such testimony. Mr. Pedersen fails to point to any authority requiring the

trial court to volunteer that certain types of prior statements can be admissible as

substantive evidence.

Even if the trial court had misspoken, Mr. Pedersen fails to show prejudice.

The trial court made clear Mr. Pedersen had the right to call any witnesses to N.R.'s

prior statements. Yet Mr. Pedersen declined to do so. There is no reason to think Mr.

Pedersen's choice not to call witnesses was based on a misunderstanding regarding

whether their statements would be considered impeachment or substantive evidence.

*Role of standby counsel*

Mr. Pedersen argues the trial court abused its discretion in limiting the role of

standby counsel to legal research, assisting with subpoenas, facilitating communication

with the State, and answering legal and procedural questions during trial. Mr. Pedersen

did not ask standby counsel to play a greater role and he cites no authority to suggest a

trial court is obliged to offer a menu of services from standby counsel. "[T]here is no absolute right of the pro se defendant to standby counsel." *State v. DeWeese*, 117 Wn.2d 369, 379, 816 P.2d 1 (1991). It is appropriate for a trial court to define standby counsel's role so counsel knows their obligations, does not infringe on the defendant's right of self-representation, and is not forced to serve as the defendant's law clerk or assistant. *See State v. Silva*, 107 Wn. App. 605, 627-28, 27 P.3d 663 (2001). The trial court here exercised appropriate discretion in defining the role of Mr. Pedersen's standby counsel.

### *Access to witnesses*

Finally, Mr. Pedersen argues the trial court interfered with his ability to prepare his defense by signing a pretrial release order prohibiting him from contacting any and all witnesses. We disagree with this assessment. By the time Mr. Pedersen was released from custody, N.R. and her mother had already been interviewed by standby counsel and an investigator. Mr. Pedersen had authorization to use the services of the investigator to conduct pretrial interviews. Mr. Pedersen utilized his authorization to interview N.R.'s grandmother and Detective Evitt. During the pretrial process and trial, Mr. Pedersen never objected to the adequacy of the investigative tools provided by the trial court. His claim the trial court impaired his right to prepare a defense fails as a factual matter.

*Unpreserved trial errors*

For the first time on appeal, Mr. Pedersen claims the State committed various trial errors by illegally introducing evidence and engaging in improper argument. Litigants are generally not entitled to appellate review of unpreserved errors. *See* RAP 2.5(a). An exception exists for "manifest error affecting a constitutional right." RAP 2.5(a)(3). This exception is a narrow one. *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). Even in the criminal context, it does not entitle a party to review of an unpreserved issue based simply on the claim of a constitutional right to a fair trial. *See id.* Instead, the alleged constitutional error must be truly constitutional in nature, instead of mere trial or evidentiary error. *See State v. Powell*, 166 Wn.2d 73, 84, 206 P.3d 321 (2009). In addition, to be a candidate for review, the error must be "manifest," such that the existing record shows the error had a practical and identifiable impact on trial. *Kirkman*, 159 Wn.2d at 935.

The errors identified by Mr. Pedersen include allegations of improper opinion testimony, introduction of hearsay evidence, and prosecutorial misconduct during summation. We discuss each of the claims in turn.

*Opinion testimony*

Mr. Pedersen claims the prosecutor improperly elicited opinion testimony from

three of the State's witnesses: N.R.'s grandmother, Jessica Johnson, and Detective Evitt.

Our case law makes clear that witness testimony touching on an ultimate issue of fact,

such as the veracity of a complaining witness, is not automatically reviewable as a

manifest constitutional error. *Id.* at 936. Instead, "'[m]anifest error' requires a nearly

explicit statement by the witness that the witness believed the accusing victim." *Id.*

### 1. N.R.'s grandmother

The statement from N.R.'s grandmother is contained in the following testimony on

direct examination:

> Q. . . . Did you tell [N.R.] what to say to make a disclosure?
> A. No.
> Q. When [N.R.] was crying and telling you, did you have any doubt in
>     what she was saying?
> A. No.

1 RP (Feb. 13, 2020) at 413.

The grandmother's testimony does not include an explicit or nearly explicit

statement that she believed the truth of N.R.'s allegation. Mr. Pedersen's defense strategy

was to raise doubts about N.R.'s recollections about her abuse. He focused on the

possibility N.R. mistook him for a different possible perpetrator. Given N.R. was crying

at the time she made a disclosure to her grandmother, it appears the prosecutor's question

was designed to address the clarity of the information relayed by N.R., not the veracity of

what she was saying.

### 2. Jessica Johnson

The testimony from Jessica Johnson was elicited during redirect examination. On

cross-examination, Mr. Pedersen engaged Ms. Johnson in the following question and

answer:

> Q.   . . . Do children lie?
> A.   In my experience, not very often; but, yes, it could happen.

*Id*. at 401-02.

> The prosecutor followed up on this question during redirect:

> Q.   Ms. Johnson, when we're talking about children lying, what does the
>      research say about children lying about sexual abuse? Does that
>      happen frequently?
> A.   No. It's less than four percent.
> Q.   Of all reported sexual assaults?
> A.   Yes.

*Id*. at 402.

Ms. Johnson's testimony did not constitute a comment on N.R.'s credibility.

Her testimony was limited to children in general, not N.R. specifically. The testimony

was in direct response to the topic opened by Mr. Pedersen during cross-examination.

It was not improper.

### 3. Detective Evitt

The testimony at issue from Detective Evitt is more considerably extensive, as it

involved his description of the protocols used to interview N.R. The following excerpts

from the State's direct examination are relevant to Mr. Pedersen's claims:

Q.  . . . So when you're interviewing a child, are there certain steps or protocols that you follow?

A.  Yes. And that's where the Child Forensic Interview training comes along. It's a 40-hour course that—from my recollection of that, it's research based. The design of the course is to be as—as least suggestive to kids and how to ask questions as well as the initial— some of the initial protocols before asking the questions that are pertinent to the investigation to get an idea of their ability to communicate . . . .

. . . .

Q.  And why do you ask for a promise to tell the truth?

A.  Again, based on the training, there are studies that show that have looked at child interviews over the years that that [sic] eliciting of a promise to tell the truth gets the desired results of kids will tell the truth.

. . . .

Q.  Are there certain types of questions that you stay away from when you're doing a child forensic interview?

A.  Anything suggestive. And I'm not perfect. I know that I've asked suggestive questions on occasion. But suggestive questions, *yes* or *no* questions, unless the *yes* or *no* question is followed up with an open-ended question. . . .

. . . .

Q.  When you interviewed [N.R.], did you use this protocol?

13

A.    Yes.

. . . .

Q.    And does it surprise you that there would be testimony from her grandmother that he touched her vagina and then with you it was very close to her vagina?

A.    No, not at all.

Q.    Why not?

A.    The—based on my experience with interviewing people, the—the things that happened to the individual are—are imprinted in their minds differently than someone that is listening about that, and then you add time on to that as well. . . . And so I think the most critical piece of that is if it didn't happen to you, it's—it's not typically—the detail of it isn't necessarily remembered as well.

. . . .

Q.    What word did she use?

A.    She used the word "stick."

Q.    And is it uncommon in your experience for a child to use—to not be comfortable using the anatomically correct word?

A.    It's more common that children, regardless of age . . . . It's not uncommon. Most actually use whatever word typically they use in their family. . . .

. . . .

Q.    Was [N.R.] consistent with you in what she told from you [sic] the first interview to the second interview?

A.    Yes. . . .

. . . .

Q.    Did you have any concerns about [N.R.'s] account of her abuse?

A.    I did not.

Q.    Have you had interviews in the past where you've had concerns?

A.    Yeah.

. . . .

Q.    Detective Evitt, based on your training and experience, are there things that you would expect to see if [N.R.] was just mimicking what happened to [her cousin] as part of her outcry?

          THE DEFENDANT: Objection. Speculation.

          THE COURT: Sustained without further foundation.

14

[PROSECUTOR]: Your Honor, he's testified at length that he's been a person [sic] detective for six years, that he's received extensive training in sexual abuse and sexual assault and handled two hundred plus child sexual assault cases. I believe that gives him a basis on—based on his training and experience to comment on that issue.

THE COURT: I don't know that it does, so you'll need to lay a foundation.

. . . .

Q.      . . . Detective Evitt, as part of your training, do you—have you spent time learning and studying about how to determine if there are concerns with regards to a disclosure of sexual assault or sexual abuse?

A.      Yes. That's been a part of many trainings that I've been to.

Q.      And in every case that you take, do you take the time to be critical of the disclosure to make sure that you are proceeding appropriately?

A.      Yes. My goal is to be both as thorough and as critical as I can.

Q.      And as part of your training and experience, have you learned about specific things that can happen when a disclosure is not true?

A.      Yes. I've noticed a few things.

Q.      And have you received specific training in signs to look for when there has been a coaching of a disclosure?

A.      Yes, there are some of those.

Q.      And so what are some of the signs that you would look for when there's been coaching of a disclosure?

A.      Some of them could be in particular with a physical act that is being described where the detail is lacking or perhaps there's an *I*—a significant amount of *I don't remembers*. Or we're also trained to look for the sights and smells and feelings and, you know, things that would be associated with a traumatic event that people in general, including children, would—would have—would have as a memory.

Q.      When you interviewed [N.R.], was she able to tell you all the sights that she had surrounding both incidences of abuse?

A.      She had some sights and they were very specific and some of the ancillary things around the room or—She did not describe, you

15

know, colors, and—but it was very specific to her—to her where she was located in relation to Mr. Pedersen.

Q.  Did she have specific recollection of words that were said during the abuse?

A.  Yes, she did.

Q.  When a child is—when you're concerned about coaching, is there also a concern about the consistency of the disclosure?

A.  Yes.

Q.  Why is that a concern?

A.  In general, not just with children, but when people talk about events that haven't happened or they're trying to remember something that they were either told or they made up themselves, it's very difficult to create the same details more than one time.

Q.  And when did you initially interview [N.R.]?

. . . .

A.  . . . The date of the forensic interview was July 11 of 2018.

. . . .

Q.  Was [N.R.] clear to you during the interview with her about where precisely each act of sexual abuse took place?

A.  As I recall in the initial stages of talking about what had happened, she mentioned that both incidences happened in one house. . . . And then towards the end . . . she separated them into the big—the front house and the back house. She didn't use the word *dollhouse* with me. . . .

Q.  Does that cause you any pause with regards to her disclosure that she had the location first altogether and then separated out upon further questioning?

A.  No.

Q.  Why not?

A.  Because when a child victim and/or even an adult, when trauma happens, there are things that you don't remember. At least that's been my experiences. . . .

Q.  So at times, it can be significant; at times, it cannot?

A.  Very circumstantial.

Q.  Detective, based on your training and experience, why would [N.R.] only disclose part of her abuse initially to her family?

16

> THE DEFENDANT: Objection. Speculation.
> THE COURT: It was phrased in terms of his training and experience. I'll allow the question.
> THE WITNESS: Just based on my training and experience, sometimes—and it's personality and circumstances—some people don't feel comfortable disclosing everything all at once. . . . I mean, there isn't any one particular answer. There's multiple reasons why somebody might not disclose all of something at one time.

*Id*. at 446, 448, 450-53, 455, 457, 477-83.

The foregoing excerpts show Detective Evitt's testimony was focused on generalized issues regarding memory and recall. He also addressed potential concerns that he might have influenced N.R.'s testimony through the use of suggestive questioning. Our decisions have held these are permissible topics for expert opinions. *See State v. Willis*, 151 Wn.2d 255, 262-64, 87 P.3d 1164 (2004); *State v. Morales*, 196 Wn. App. 106, 122-25, 383 P.3d 539 (2016).

At times, Detective Evitt indicated that, based on his training and experience, he did not see any red flags with respect to N.R.'s account of abuse. But testimony that N.R. did not show signs of coaching, inconsistency, or other fabrication is not the same as explicitly stating N.R. was telling the truth or that Detective Evitt believed N.R. *See State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Indeed, a witness may provide a clear and consistent account of an event that raises no red flags, but is nevertheless false.

*Kirkman*, 159 Wn.2d at 930 ("A witness or victim may 'clearly and consistently' provide an account that is false.").

This case is far different from our recent decision in *State v. Cook*, 17 Wn. App. 2d 96, 484 P.3d 13 (2021). In *Cook*, the prosecutor engaged in repeated acts of vouching, including improperly asking witnesses to opine on the victim's credibility. A primary distinction between *Cook* and this case is that the prosecutor's actions in *Cook* generated at least some objections, which were overruled. In addition, the testimony in *Cook* contained far more explicit evaluations of the victim's credibility than what occurred here. For instance, when questioning the investigative detective in *Cook*, the prosecutor elicited testimony that it was the detective's practice to inform the prosecutor if he believed a victim was "lying," but no such information was reported in Mr. Cook's case. *Id*. at 102. The prosecutor also elicited testimony from a forensic interviewer that her interview process was "shown to produce truthful and accurate information." *Id*. Here, Detective Evitt never indicated he had made an assessment of whether N.R. was lying, he merely explained how N.R.'s interview did not raise any red flags when judged according to his forensic training. Unlike the interviewer in *Cook*, Detective Evitt never said his interview was designed to elicit the truth. Instead, Detective Evitt focused on ways in

which his interview was designed not to influence the child's testimony and to evaluate some red flags.

It is often appropriate for the prosecution or defense to elicit testimony regarding human memory and forensic interview techniques. In such cases, the line between permissible expert testimony and an improper opinion about credibility can become blurry. It is for this reason an objection is so important. A timely objection allows the trial court to orient the witness's testimony and remind the jury of their independent role in determining credibility. But when no objection is made, the nebulousness of the witness's testimony becomes irreparable. Appellate intervention is unwarranted in such circumstances.

Because Mr. Pedersen has not shown the State's witnesses provided explicit or nearly explicit opinions regarding N.R.'s credibility, his unpreserved complaints regarding improper opinion testimony will not be reviewed.

*Hearsay evidence*

Mr. Pedersen alleges the prosecutor improperly introduced evidence of N.R.'s prior consistent statements in violation of evidentiary hearsay rules. We decline to review this argument under RAP 2.5(a). Because N.R. testified, Mr. Pedersen's arguments do not implicate his constitutional right to confront witnesses. *See Crawford v. Washington*,

541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Moreover, even if there were a confrontation issue, this type of constitutional claim is not one that can be raised for the first time on appeal. *State v. Burns*, 193 Wn.2d 190, 210, 438 P.3d 1183 (2019).

Mr. Pedersen attempts to recast his hearsay argument as constitutional error by claiming it constituted prosecutorial misconduct. But prosecutorial misconduct is not a stand-alone constitutional claim. If an allegation of prosecutorial misconduct could resurrect an unpreserved evidentiary error, such as the introduction of hearsay evidence, RAP 2.5(a)'s exception for unpreserved errors would no longer be narrow. The exception would swallow the rule. We decline to review Mr. Pedersen's unpreserved hearsay arguments.

### *Improper argument*

Mr. Pedersen argues the prosecutor committed misconduct in summation by suggesting N.R. was credible because she repeated her statements. Because this issue was not preserved, review turns on whether Mr. Pedersen can show the prosecutor's actions were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Here, the burden has not been met. The prosecutor is allowed to argue their case. This includes arguing the evidence at trial supports the victim's credibility. The fact that Mr. Pedersen

could have asserted a hearsay objection to some of the evidence supporting N.R.'s credibility did not bar the prosecutor from making arguments regarding the admitted evidence. There was no flagrant and ill-intentioned misconduct. *See State v. Copeland*, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996) ("Prosecutors may argue inferences from the evidence, including inferences as to why the jury would want to believe one witness over another.").

*Sentencing issues*

At sentencing, Mr. Pedersen's offender score was enhanced by a prior conviction for possession of controlled substances. The Supreme Court has since decided in *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), that controlled substance convictions, such as Mr. Pedersen's, are void. A void conviction cannot be used to enhance a defendant's offender score. *See State v. Ammons*, 105 Wn.2d 175, 187-88, 713 P.2d 719, 718 P.2d 796 (1986). Accordingly, Mr. Pedersen is entitled to resentencing.

At resentencing, Mr. Pedersen may ask for all discretionary legal financial obligations to be struck from the judgment and sentence based on indigence, including Department of Corrections supervision fees imposed pursuant to RCW 9.94A.703(2)(d). *See State v. Spaulding*, 15 Wn. App. 2d 526, 536, 476 P.3d 205 (2020).

No. 37538-2-III
*State v. Pedersen*

CONCLUSION

Mr. Pedersen's conviction is affirmed. This matter is remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:


_____
Lawrence-Berrey, J.


_____
Staab, J.