Filed 3/5/14

CERTIFIED FOR PARTIAL PUBLICATION[1]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063169 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD240156) |
| JAMES JOSEPH FOX, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge. Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, William M. Wood and Scott Charles Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

---

[1] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.B.

# I.

## INTRODUCTION

The People charged James Joseph Fox with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[2] (count 1) and misdemeanor vandalism (§ 594, subds. (a) & (b)(2)(A) (count 2).  At a recess during the prosecutor's direct examination of the victim, the trial court granted Fox's request to represent himself for the remainder of the trial. The jury found Fox guilty on both counts.  The trial court sentenced Fox to the upper term of four years in prison on count 1, and sentenced him to time served on count 2.

On appeal, Fox contends that he did not knowingly, intelligently, and voluntarily exercise his right to self-representation because the trial court incorrectly advised him that count 1 was not a strike offense.  In the published portion of this opinion, we reject this claim.  In the unpublished portion of this opinion, we reject Fox's contention that the trial court abused its discretion in denying probation, and in sentencing him to the upper term. We reject these claims and affirm the judgment.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The People's evidence*

The victim, Coleen Grisso-Limas, began dating Fox in April 2011.  On March 27, 2012, Fox contacted Grisso-Limas about the return of an electric comb that she had borrowed from him.  Fox was adamant that Grisso-Limas return the comb and threatened

---

[2]    All subsequent statutory references are to the Penal Code, unless otherwise specified.

to break all of the windows in Grisso-Limas's house if she failed to return it. Grisso-Limas agreed to return the comb and arranged to meet Fox at a gas station. Grisso-Limas wanted to meet in a public place because Fox sounded extremely upset.

Fox arrived at the gas station in a blue Toyota convertible. Grisso-Limas was driving a red pickup truck. As Fox pulled his car close to the red pickup truck, Grisso-Limas opened her window a couple of inches and pushed the comb out of the window. Grisso-Limas kept the doors to her car locked because she was afraid of Fox. Fox got out of his car and began yelling expletives at her. Fox started walking back to his car and then picked up a rock and threw it at Grisso-Limas's truck, breaking the rear driver's side window. Grisso-Limas began to drive off at a high rate of speed because she was afraid.

Fox followed Grisso-Limas. He drove close behind her truck, yelling at her. Fox threw another rock at her truck. Several vehicles pulled over in response to the chase, which was taking place in a residential area near a school. At one point, Fox passed Grisso-Limas's truck, made a u-turn in the street, and then drove straight at the truck. Although Fox turned his car at the last minute, his car struck the front driver's side of the truck.

After the collision, Fox got out of his car and started to approach Grisso-Limas's truck. Grisso-Limas again drove away, and Fox got back into his car and followed her. Fox bumped the truck twice on the driver's side. At one point, when Grisso-Limas became stuck in traffic, Fox got out of his car, approached her truck, and started to reach through the truck's broken window in an attempt to unlock the door. As he did this, Grisso-Limas started to drive forward, and Fox fell off the truck.

3

As the incident was unfolding, Grisso-Limas and two eyewitnesses called 911. Police officers arrived at the scene after Fox had fallen from the truck.

B.    *Defense evidence*

The defense elicited evidence that Fox had attempted to avoid the collision between his car and the victim's truck. Grisso-Limas told a defense investigator that she had overreacted during the incident. Grisso-Limas's son testified that Fox and his mother had spent a lot of time with each other, and that they used methamphetamine together.

III.

DISCUSSION

A.    *Fox validly waived his right to counsel*

Fox contends that the trial court violated his Sixth Amendment right to counsel. Specifically, Fox maintains that he did not knowingly, intelligently, and voluntarily exercise his right to self-representation because the trial court misadvised him that count 1 was not a strike offense. On appeal, we independently examine the entire record to determine whether Fox's waiver of his right to counsel was valid. (See *People v. Burgener* (2009) 46 Cal.4th 231, 241 (*Burgener*).)

1.    *Factual and procedural background*

a.    *The trial court's comments during a pretrial hearing*

Three days prior to the start of trial, defense counsel informed the court that Fox had made statements to counsel indicating that Fox believed he was being denied his right to represent himself. The court held a hearing for the purpose of determining whether Fox was requesting that the trial court appoint substitute defense counsel or

4

whether Fox was seeking to represent himself. During the hearing, Fox expressly and unequivocally stated that he was not requesting that the court appoint new counsel or that he be allowed to represent himself.

Near the end of the hearing, the following colloquy occurred:

"[Fox]: I'm asking for a clarification—

"The court: Okay.

"[Fox] —of what the law says. I've been charged with [section] 245[, subdivision] (a)(1).

"The court: Okay.

"[Fox]: It was explained to me as a naked [section] 245[, subdivision] (a)(1) because—

"The court: Which means it can't be used as a strike.

"[Fox]: And they're not alleging a deadly weapon.

"The court: Correct. Or—and then there's the other part with the force likely to produce great bodily injury[3] that's—

"[Fox]: Okay. That's where the question comes right there."

Fox proceeded to ask the trial court a question concerning whether it was necessary for the victim to have suffered an injury in order for him to be found guilty of a

---

3    Former section 245, subdivision (a)(1) included both assault with a deadly weapon and assault with force likely to produce great bodily injury. (§ 245, subd. (a)(1), as amended by Stats. 2011, ch. 15, § 298 ["Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished . . . "].)
    In August 2011, the Legislature deleted from subdivision (a)(1) the phrase "or by any means of force likely to produce great bodily injury" following the word "firearm" and added a new subdivision (a)(4) to section 245 that defined the offense of assault by force likely to produce great bodily injury. (Stats. 2011, ch. 183, § 1.)

violation of section 245, subdivision (a)(1). During that exchange, the following colloquy occurred:

> "[Fox]: What I don't understand in reading the other Penal Codes surrounding [section] 245[, subdivision] (a)(1), with regards to assault, with regards to assault and battery, I could literally grab feces, throw it at a cop, hit him in the head, punch him in the face, knock him out, and I'm looking at zero to one for assault and battery.
>
> "[Defense counsel]: Oh no, you're not.
>
> "[Fox]: With this—if that's what I'm charged with. That's what it says in the Penal Code. But if I'm charged with this, everything I read show it's, what was the injury? But there was no injury.
>
> "[The court]: It's—and again, I'm just going to just repeat what the charge is. It's assault likely to create bodily injury. There are assault cases where there is no bodily injury."

    b.    *Fox's waiver of counsel during trial*

At a recess during the prosecutor's direct examination of the victim, four days after the pretrial hearing described above, Fox orally requested that he be allowed to represent himself for the remainder of the trial. Fox explained that he wanted the opportunity to cross-examine the victim himself and to call additional witnesses who defense counsel had indicated she did not intend to call to testify. The court asked Fox whether he had filled out "the *Lopez* form."[4] The following colloquy then occurred:

> "[Fox]: All except for the parts that I don't know the answer to. Asking about maximum punishment and offenses, charges. Everything else has been checked.

---

4    (See *People v. Lopez* (1977) 71 Cal.App.3d 568, 570 (*Lopez*) ["explor[ing] the responsibilities of the trial court in making an adequate record that a criminal defendant 'voluntarily and intelligently' elects to represent himself"].)

"[Defense counsel]: He does have a copy of the complaint. It's been provided.

"The court: Say again?

"[Defense counsel]: I have provided him with a copy of the complaint, so he does have that information."

The court advised Fox that the maximum punishment for the charged offenses was five years. Fox filled out the remainder of the *Lopez* form and signed it.[5] The form states, "The defendant wishes to exercise the right to self-representation without the help of an attorney." It lists "245 A-1" and "594 misdemeanor" as the charged offenses. The form also contains checkmarks next to numerous admonishments concerning the act of self-representation.

Specifically, the form indicates that: (1) the court will not give a self-represented defendant special treatment; (2) the defendant will have to comply with all rules of criminal procedure and evidence; (3) the defendant has a right to counsel and, if indigent, a right to have an attorney appointed at no cost; (4) an experienced prosecutor will oppose the defendant; (5) no special library privileges will be available; (6) the court will not grant extra time for preparing the case for motions or for trial; (7) the court will not assign a special investigator to provide assistance; (8) the court will terminate self-representation if the defendant engages in disruptive behavior; and (9) the defendant cannot claim incompetency of counsel as an issue on appeal.

_____

[5]    While filling out the form in court, Fox stated, "I used the portion of the complaint . . . to send letters, because I don't have any paper. So that's why I don't have copies."

After receiving the signed *Lopez* form from Fox, the court held a *Faretta*[6] hearing concerning Fox's request to represent himself.  The trial court began by asking Fox, "What are you charged with in this information?"  Fox responded, "245(a)(1)[,] punishable by two, three, and four and misdemeanor vandalism, punishable also by up to one year."  The court then ascertained that Fox understood the nature of the alleged acts on which the charged crimes were based.

The trial court asked Fox if he understood that he would not receive any special treatment and that he would have to comply with all substantive and procedural rules of law and evidence.  Fox responded in the affirmative.  The court also explained that if it were to grant Fox's request to represent himself, the court would not grant a continuance, and the trial would proceed as scheduled.   Fox confirmed that he knew he was giving up his right to be represented by an attorney, and that the prosecution would continue to be represented by a skilled lawyer.  The court additionally admonished Fox that he would not be able to claim on appeal that he had represented himself ineffectively.  The court also stated, "Do you also understand that self-representation is almost always unwise and that persons exercising such right may conduct the case in a manner harmful to themselves?"  Fox responded in the affirmative.

The court asked Fox to describe his educational background.   Fox explained that he was able to read and write, that he had graduated from high school, and that he had

---

6        (See *Faretta v. California* (1975) 422 U.S. 806, 807 (*Faretta*) [concluding a criminal defendant has a "constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so"].)

8

attended college for two years. The court also asked Fox whether he had seen a psychiatrist in the past. Fox responded in the affirmative, and said that he been diagnosed with "wounded bird syndrome." When asked to explain this diagnosis, Fox stated, "I tend to want to help people way too much, until it affects my life." Fox stated that he had not been on any medication in the past.

The court proceeded to discuss with the prosecutor and defense counsel the circumstances surrounding a different trial judge's denial of Fox's request to represent himself earlier in the case. The prosecutor explained that at a prior *Faretta* hearing, Fox had been "extremely disrespectful to the court." Defense counsel stated that Fox had been "highly emotional" during the prior hearing. After hearing from both counsel concerning Fox's previous request to be allowed to represent himself, the court stated that it had reviewed the *Lopez* form "item by item" with Fox at this hearing, and that it was going to grant Fox's request. The court added, "I don't think it is in his best interest, but then that's typical of this situation. At this point[,] I cannot point to anything that I think would be a valid basis to deny the motion." After the court granted Fox's request to represent himself, defense counsel confirmed that she had given Fox copies of the police report, the complaint, and the preliminary hearing transcript. Defense counsel indicated that she would provide Fox with a copy of the remainder of her file, as well.

        c.     *The trial court's comments during a hearing concerning jury instructions*

After both the People and the defense had rested, during a conference outside the presence of the jury concerning jury instructions, the court discussed with Fox and the

9

prosecutor the court's belief that a unanimity instruction[7] was required with respect to

count 1 (assault with a deadly weapon).  During this discussion, the following colloquy

occurred:

> "The court:  . . . I do think that we need to talk a little bit about the assault with a deadly weapon because . . . the throwing of the rock could technically have been charged as that also, as [an] assault with a deadly weapon.  And so I'm assuming the People are arguing that the assault with a deadly weapon is with the car and the vandalism is with a rock in the window.

> "[Prosecutor]: Right.  Yes.

> "[Fox]: I was told by—

> "The court: Pardon me?

> "[Fox]: I was told by Ms. —

> "The court: [Defense counsel].

> "[Fox]: Yeah, it was a naked 245 and there was no allegation of a deadly weapon.

> "The court: I don't know how to answer that anymore.  I believe that what you have is—well, you have a copy of the information, and you have a copy of the instructions at this point.  [¶]  [Ms. Prosecutor], do you believe that the charge which has been filed is a strike?

> "[Prosecutor]: I think that it could later be used as a strike if there was an investigation of the facts of the case, but I don't believe as it's presently charged.

> "[The court]: That was my understanding as well, that as it is, it would qualify as a naked, as Mr. Fox is calling it, a naked 245(a).

---

7    A unanimity instruction informs the jury that it may not find the defendant guilty unless it unanimously agrees that the defendant has committed the same criminal act. (See CALCRIM No. 3500.)

10

The catch is that . . . there are times when the court can look behind a conviction and could make a finding that the car was a deadly weapon. And I can [*sic*] make any representations [*sic*] to that. So it is what it is. It's that charge, and that's why I keep referring back to the information. You have what the charge is, but the reason I'm bringing that up has to do with the . . . unanimity instruction."

"[Fox]: Do I have that?"

After this exchange, the court, Fox and the prosecutor continued their discussion concerning the court's intent to provide a unanimity instruction with respect to count 1.

2.      *Law governing a defendant's waiver of counsel*

In *Burgener*, *supra*, 46 Cal.4th at pages 240-241, the California Supreme Court outlined the general law governing a determination of the validity of a defendant's waiver of his constitutional right to counsel:

> " 'A criminal defendant has a right, under the Sixth Amendment to the federal Constitution, to conduct his own defense, provided that he knowingly and intelligently waives his Sixth Amendment right to the assistance of counsel. [Citation.] A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." [Citation.] "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' [Citation.] Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.]"

11

3.	*The trial court's statements to Fox suggesting that count 1 was not a strike did not render his waiver of counsel invalid*

Neither Fox, nor the People, nor our own research, has revealed any California case law specifically addressing the circumstances under which a trial court's providing incorrect advice may render a defendant's waiver of counsel invalid. However, after considering several factors that we believe are relevant to this inquiry, we conclude that the record as a whole demonstrates that Fox "understood the disadvantages of self-representation, including the risks and complexities of the particular case" (*Burgener*, *supra*, 46 Cal.4th at p. 241), despite the trial court's statements concerning the potential future penal consequences of a conviction on count 1 for purposes of the three strikes law, and that his waiver of his right to be represented by counsel was knowing, intelligent and voluntary.

As a threshold matter, we consider the nature of the allegedly incorrect advice. As quoted above (see pt. III.A.1.a., *ante*), when Fox stated to the trial court that it was his belief that he was charged with "a naked 245 (a)(1)," the court interrupted Fox to define the term "naked 245 (a)(1)" as meaning "it can't be used as a strike."[8] Fox then stated, erroneously, "they are not alleging a deadly weapon," to which the trial court incorrectly

_____

[8]	It is undisputed that assault with a deadly weapon (count 1) (§ 245, subd. (a)(1)) *is* a strike offense. (§ 1192.7, subd. (c)(31) [serious felony for purposes of the three strikes law includes "assault with a deadly weapon . . . in violation of Section 245"].) It is also undisputed that assault with force likely to produce great bodily injury is not, by itself, a strike offense. (See, e.g., *People v. Feyrer* (2010) 48 Cal.4th 426, 442, fn. 8.) "When 'the additional element of personal infliction' of great bodily injury is found present, however [citation], then for purposes of the Three Strikes law, the offense of assault by means of force likely to produce great bodily injury constitutes a serious felony . . . ." (*Ibid*.)

12

responded, "Correct." Later during the same colloquy, the trial court incorrectly stated that Fox had been charged with "assault likely to create bodily injury." Thus, the trial court did not expressly advise Fox that count 1 was not a strike offense and the trial court's misstatements upon which Fox bases his claim were clearly made in response to misinformation provided by *Fox* as to the nature of the charges against him. However, since the ultimate question in determining whether Fox validly waived his right to counsel is "what the defendant understood" (*Burgener, supra*, 46 Cal.4th at p. 241), we acknowledge that a trial court's misstatements, regardless of their origin, *may* result in an invalid waiver of the right to counsel. (See *People v. Goodwillie* (2007) 147 Cal.App.4th 695, 734-735 (["Although a propria persona defendant is responsible for informing himself regarding the substantive and procedural law at issue in his case, the court and the prosecutor, as officers of the court, have a duty not to misstate the law, whether intentionally or not"].) We must therefore examine further whether the trial court's misstatements concerning the potential future consequences of Fox's criminal conviction rendered his subsequent waiver of the right to counsel invalid.

In this regard, we next consider whether Fox was provided with any information that corrected the trial court's inaccurate statement that Fox was charged with assault with force likely to produce great bodily injury, and the court's suggestion that this offense did not constitute a strike offense. (See *People v. Conners* (2008) 168 Cal.App.4th 443, 455 [rejecting claim that defendant did not knowingly waive right to counsel on ground that trial court did not properly advise of potential penal consequence at *Faretta* hearing

13

because court provided the required information to defendant prior to trial and confirmed that defendant wished to continue to represent himself].)

At the hearing at which the trial court granted Fox's request to represent himself, defense counsel expressly stated on the record that she had provided Fox with copies of the accusatory pleading that contained the charged offenses. Both the initial complaint and the information unambiguously charged Fox in count 1 with assault with a deadly weapon.[9] Both the complaint and the information state in relevant part:

> "Count 1 - ASSAULT WITH DEADLY WEAPON
> On or about March 27, 2012, JAMES JOSEPH FOX did unlawfully commit an assault upon another with a deadly weapon and instrument, in violation of PENAL CODE SECTION 245 (a)(1)."

Fox was arraigned on the information. It is also undisputed that Fox attended the preliminary hearing at which the trial court ordered that Fox be held to answer on the charged offense of assault with a deadly weapon, and that defense counsel confirmed at the *Faretta* hearing that Fox had been provided with a copy of the preliminary hearing transcript.

While it is true that at one pretrial hearing both Fox and the trial court misspoke concerning the nature of the offense charged in count 1, the record is clear that by the time Fox elected to represent himself, Fox had repeatedly been correctly informed that he was charged with committing an assault with a deadly weapon. Further, as noted

---

[9]    Defense counsel stated that Fox had "the complaint." As noted in the text, both the complaint and the information charge Fox with assault with a deadly weapon.

14

previously, it is undisputed that assault with a deadly weapon is a strike offense. (§ 1192.7, subd. (c)(31).)

We next consider the relationship between the trial court's misstatements concerning the charge in count 1 and Fox's request to represent himself. The trial court's statements were made during a pretrial hearing four days before Fox requested to represent himself, and did not directly relate to the issue of the "dangers of self-representation." (*Burgener*, *supra*, 46 Cal.4th at p. 241.)[10] Rather, the court's misstatements pertained to the possible future consequences of a conviction on count 1, a collateral subject as to which Fox concedes he would not have been entitled to any admonishment, even if had he had pled guilty to the charged offense. (See *People v. Bernal* (1994) 22 Cal.App.4th 1455, 1457 [prior to pleading guilty to the charged offense, "[a] defendant need not be advised of the possible future use of a conviction in the event the defendant commits a later crime"].)

Most importantly, we see no evidence in the record that Fox's decision to represent himself was in any way related to the misinformation that the trial court provided concerning the collateral consequences of a conviction on count 1, for purposes of the three strikes law. Fox argues in his brief that "[a]ppellant was apparently extremely concerned about this issue because he specifically asked the trial court about it during a . . . hearing, four days before he made his motion for self-representation." On the contrary, a fair reading of the hearing colloquy to which Fox refers, quoted above (see

---

10     Fox acknowledges that the "the trial court . . . g[a]ve extensive warnings and inquired of [him] regarding the risks and dangers of self-representation."

pt.III.A.1.a, *ante*), reveals that Fox was concerned with whether it was necessary for the victim to have suffered an injury in order for him to be found guilty of a violation of section 245, subdivision (a)(1), and that the trial court's comments concerning the nature of a "naked 245 (a)(1)" were essentially an aside.

Further, at the hearing at which the trial court granted Fox's request to represent himself, the court admonished Fox at length regarding the dangers of self-representation, and there is nothing in the record of that hearing that suggests that whether count 1 was a strike offense had any bearing on Fox's decision to waive his right to be represented by counsel. Rather, Fox stated that his request to represent himself was premised on his desire to cross-examine the victim himself, and to call certain witnesses who defense counsel had indicated she did not intend to call.[11] Moreover, during the jury instruction conference, after the trial court expressly told Fox that count 1 might be a strike offense,[12] Fox did not argue that his previous waiver of counsel had been invalid based on his misunderstanding of the potential consequences of the charge in count 1, nor did

---

[11]    At the hearing, Fox stated, "So I'm ready to relieve her now. Because I want to question this witness for sure. [¶] I also want to call other witnesses that are on the witness list . . . that she's not going to call."

[12]    Fox is correct that the trial court was mistaken in suggesting at the jury instruction conference that a conviction on count 1 was not, as charged, a strike offense. (§ 1192.7, subd. (c)(31) [serious felony for purposes of the three strikes law includes "assault with a deadly weapon . . . in violation of Section 245"].) However, any misstatements by the court at the jury instruction conference could not have affected Fox's *prior* decision to waive his right to counsel. (See *United States v. Erskine* (9th Cir. 2004) 355 F.3d 1161, 1170 (*Erskine*) [whether a defendant has validly waived his right to counsel is determined by an examination of the defendant's state of mind *at the time* he waived the right to counsel]).)

he seek to have counsel reappointed to represent him for the remainder of the proceedings. Thus, even assuming that Fox is correct in arguing that if a "defendant waives counsel and represents himself *based upon* [the trial court's] incorrect advice, . . . the waiver of counsel is invalid and involuntary"[13] (italics added), there is simply no evidence that Fox relied on the trial court's misstatements in deciding to ask to represent himself in this case. (Cf. *People v. D'Arcy* (2010) 48 Cal.4th 257, 286 [rejecting claim that trial court violated defendant's right to self-representation by misadvising defendant that he could decide which defense theory counsel would present because "defendant fails to show that he actually relied on the court's misadvisement in relinquishing his right to self-representation"].)

After considering the nature and context of the trial court's misstatements and the relationship between the trial court's misstatements and Fox's request to represent himself, we conclude that Fox validly waived his right to counsel and validly exercised his right to self-representation.

*Erskine, supra,* 355 F.3d 1161, which Fox cites in his reply brief, does not compel a different result. At a *Faretta* hearing in *Erskine*, in response to the district court's

---

13    Fox notes that there are several California cases in which courts have held that " 'Where a defendant's *plea* is "induced by misrepresentations of a fundamental nature" such as a bargain which is beyond the power of the trial court, a judgment based upon the plea must be reversed. [Citations.]' " (*People v. Hollins* (1993)15 Cal.App.4th 567, 574, quoting *People v. Coleman* (1977) 72 Cal.App.3d 287, 292, italics added; see also *In re Moser* (1993) 6 Cal.4th 342, 352 ["a defendant . . . is entitled to relief based upon a trial court's misadvisement only if the defendant establishes that he . . . would not have entered the plea of guilty had the trial court given a proper advisement"].) Fox contends that the same principle should apply in the context of a waiver of the right to counsel.

questioning concerning whether the defendant knew the penalty he was facing if convicted, the defendant stated that the maximum penalty for the charged offense was *one* year. (*Erskine, supra*, at p. 1165.) The maximum penalty was actually *five* years. The district court did not inform the defendant of this fact. (*Ibid.*) On appeal, the *Erskine* court noted that Ninth Circuit case law (*United States v. Balough* (9th Cir. 1987) 820 F.2d 1485, 1487 (en banc)) required a district court to ensure that a defendant understands "the possible penalties" before permitting the defendant to waive the right to counsel. (*Erskine, supra,* at p. 1167.) The *Erskine* court held that the defendant's "waiver of his Sixth Amendment right was invalid because the court failed to advise him correctly at the *Faretta* hearing of the possible penalties he faced, and the record d[id] not show that he had an accurate understanding of the potential consequences at the time he agreed to waive that right." (*Id*. at p. 1162.)

Assuming that the trial court in this case had a duty to ensure that Fox understood the possible penalties that he was facing,[14] unlike in *Erskine*, which involved "a

---

14    In *People v. Conners* (2008) 168 Cal.App.4th 443, 455-456, the court noted that California case law is not uniform with respect to whether a trial court must ensure that a defendant knows the possible penalties for the charged offenses before permitting a defendant to exercise his right to self-representation:

> "We are aware some court of appeal cases have suggested that, to deem a *Faretta* waiver knowing and intelligent, the trial court must or should ensure the defendant understands the possible penalties, as well as the nature of the charges and the dangers of self-representation. (See *People v. Sullivan* (2007) 151 Cal.App.4th 524, 545; *People v. Noriega* (1997) 59 Cal.App.4th 311, 319.) On the other hand, one case has expressly held there is no requirement to advise a defendant seeking to represent himself of the possible penal

18

revelation that quintupled the stakes of self-representation" (*Erskine, supra,* 355 F.3d at p. 1164), it is undisputed that Fox was specifically advised at the *Faretta* hearing that he was facing a potential sentence of five years. This was correct. Further, the misadvisement at issue in *Erskine* related to a direct consequence of conviction (the maximum term of imprisonment) and was issued as part of a *Faretta* advisement. In contrast, the misadvisement in this case pertained to a collateral consequence and was stated by the court in the course of a nonresponsive remark to Fox's question about another subject during a pretrial hearing. In short, the misadvisement at issue in *Erskine* was materially different from the one at issue in this case.

We reject Fox's contention that "[as was true of the defendant in *Erskine*] appellant reasonably relied upon the trial court's inaccurate statement regarding the serious nature of count one in forming his decision to represent himself." On the contrary, for the reasons stated above, there is *no* evidence in the record that Fox considered the collateral consequences of a conviction on count 1 for purposes of the three strikes law in exercising his right to self-representation.

B.    *The trial court did not abuse its discretion in denying Fox probation or in sentencing him to the upper term*

Fox claims that the trial court erred in denying him probation and in sentencing him to the upper term. We review both contentions pursuant to the abuse of discretion standard of review. (See, e.g., *People v. Bradley* (2012) 208 Cal.App.4th 64, 89 [a trial court's denial of probation is reviewed for abuse of discretion]; *People v. Delgado* (2013)

consequences of conviction. (*People v. Harbolt* (1988) 206 Cal.App.3d 140, 149–151.)"

19

214 Cal.App.4th 914, 919 [a trial court's imposition of an upper term sentence is reviewed for an abuse of discretion].)

      1.      *Procedural background*

Prior to sentencing, the People filed a statement in aggravation and defense counsel filed a sentencing memorandum. In addition, Fox personally wrote a letter to the court and the probation officer prepared both a report and a supplemental report.

At sentencing, after hearing argument from defense counsel, the prosecutor, and Fox, the trial court denied probation and imposed an upper term sentence on count 1. In imposing this sentence, the court stated that Fox had "three things going against [him]," including drug addiction, a narcissistic personality, and an inability to take advantage of opportunities that he had been afforded to improve himself. The court further stated, "I don't think that you qualify for an exceptional circumstance [warranting a grant of probation] because it is presumptively state prison, but the bottom line is even if that law wasn't there, I would still sentence you to state prison, and I would do the upper term. You have just had too many chances, and you haven't gotten it."

With respect to the imposition of an upper term, the trial court stated that several factors supported an upper term on count 1, including that Fox had been afforded multiple opportunities to overcome his drug problem but had been unable to do so, and that Fox's conduct had "endangered not just [the victim], but also the entire community." The court also noted that Fox had suffered numerous adult convictions, that the convictions had been of increasing seriousness, and that Fox's prior performance on probation had been unsatisfactory. The court stated, "I think you're a danger to society."

2.      *Application*

    a.      *The trial court did not abuse its discretion in denying Fox probation*

The trial court clearly did not abuse its discretion in denying Fox probation.  To begin with, as Fox acknowledges, he was statutorily presumptively ineligible for probation because, among other reasons, he had previously suffered more than one prior felony conviction. (§ 1203, subd. (e)(4).)  There are numerous other reasons supporting the trial court's denial of probation, as well.  Fox has a lengthy criminal record, having suffered 11 convictions dating back to 1977.  (Cal. Rules of Court, rule 4.414(b)(1).)[15] Further, Fox previously violated probation on several occasions.  (Rule 4.414(b)(2).)  Fox also has a long-standing drug problem, and had relapsed around the time of the charged offenses.  (Rule 4.414(b)(4).)  Moreover, the circumstances of the charged offense supported a denial of probation, including that Fox inflicted serious emotional injury on the victim and also used a weapon.  (Rule 4.414(a)(2) & (a)(4).)

Fox's contentions to the contrary are not persuasive.  Fox maintains that his "long-term drug addiction" demonstrates that the trial court abused its discretion in failing to find that his case was an unusual one in which probation should be granted, despite his presumptive ineligibility.  The trial court could reasonably have found that Fox had been unable to control his addiction,[16] and that his long-standing drug problem was not a circumstance that rebutted his presumptive ineligibility for probation.  We are also

---

[15]      All subsequent rule references are to the California Rules of Court.

[16]      Fox acknowledges in his brief that "it is true as the trial court indicated that [Fox] had relapsed and was using drugs at the time of the instant offense."

21

unpersuaded by Fox's contention that the trial court abused its discretion in failing to grant probation on the ground that the circumstances of his commission of the assault with a deadly weapon in this case were "less serious" than other instances of the same crime.  Fox's conduct endangered the lives of a large number of people, including both himself and the victim.  Similarly unpersuasive is Fox's contention that the fact that he did not use "a weapon in the traditional sense" supports a grant of probation.  Finally, we reject Fox's contention that an examination of "facts relat[ed] to the defendant," under rule 4.414(b) demonstrates that the trial court abused its discretion in denying probation.  As discussed above, Fox has a lengthy criminal record, which includes both prior violent conduct and several unsuccessful grants of probation.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Fox probation.

> b. *The trial court did not abuse its discretion in sentencing Fox to an upper term on count 1*

In sentencing a defendant pursuant to section 1170, subdivision (b) of the Determinate Sentencing Law, a trial court may select any one of the three available statutory prison terms.  "The court shall select the term which, in the court's discretion, best serves the interests of justice."  (§ 1170, subd. (b).)  Although the court is required to state the reasons for its choice on the record (*id*., subd. (c)), and may be guided by a consideration of aggravating and mitigating circumstances (*id*., subd. (b)), it is not required to weigh such factors, or to cite specific facts in support of its sentencing choice. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

22

As noted above, the trial court stated that in the court's view, there were several factors that supported imposing the upper term, including Fox's long-standing inability to control his drug problem, the fact that Fox had endangered the lives of numerous people in his commission of count 1, and Fox's lengthy criminal record. These reasons amply support the trial court's exercise of discretion in selecting an upper term sentence on count 1.

In arguing to the contrary, Fox contends, "For all the same reasons that the trial court abused its discretion by denying [Fox] probation it also abuse[d] its discretion by sentencing him to the upper term." Fox's contentions that the trial court abused its discretion in sentencing him to the upper term fail to persuade us for the same reasons that they failed with respect to his claim concerning the trial court's denial of probation.

Accordingly, we conclude that the trial court did not abuse its discretion in sentencing Fox to an upper term on count 1.

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

23