Filed 7/18/23  In re Y.D. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Y.D. et al., Persons Coming Under the Juvenile Court Law. | |
| | D081754 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4727A,B) |
| v. | |
| R.D. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant R.D.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant M.O.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for minors Y.D. and G.D.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

## I

## INTRODUCTION

R.D. (Father) appeals from the juvenile court's March 6, 2023 orders denying his Welfare & Institutions Code[1] section 388 petition and terminating his and M.O.'s (Mother's) parental rights to their minor children, Y.D. and G.D. He contends the juvenile court erred by denying him court-appointed counsel. Mother also appeals and joins Father's arguments. Because we conclude there was no error and that regardless, any such error was harmless, we affirm.

## II

## BACKGROUND

## A

*Dependency Proceedings Before Father Was Relieved of Counsel*

In December 2021, the Agency filed dependency petitions for then one-year-old Y.D. and one-month-old G.D. (children) because of domestic violence between Mother and Father. The Agency alleged that during one incident, Father grabbed Mother's phone out of her hands and the phone struck newborn G.D.'s head. Mother then ran from Father while still holding G.D. Mother and Father had a history of domestic violence, including another

---

1 All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

incident approximately 12 months earlier during which Mother was arrested for hitting Father.

At Father's request, the juvenile court appointed an attorney, J.B., to represent him. Although J.B. appeared for Father at the continued detention hearing and relayed Father's position to the court, Father repeatedly interrupted the hearing to argue that the dependency proceeding documents were "falsified" and to lodge his own objections. The court made prima facie findings on the Agency's petitions and detained the children in out-of-home care.

Father began attending weekly supervised visits with the children, and the Agency referred him to a domestic violence group. Through its investigation, the Agency learned that the parents' history of domestic violence dated back to at least January 2021. Father also had a child welfare history and domestic violence history with another woman in Colorado from 2010 to 2017, and he was a convicted sex offender. Father's criminal history included convictions for domestic battery, contempt of court, and obstructing a peace officer.

During the January 2022[2] hearing to set trial, Father interrupted the court to say that he had been unable to speak with J.B. But when the court and J.B. suggested pausing the hearing so that he could talk with J.B., Father instead continued to speak directly to the court. He continued to interject throughout the remainder of the hearing.

In late January and early February, Father began independently filing documents in pro per. These filings included section 388 petitions asking the juvenile court to terminate its jurisdiction and alleging that the Agency had

---

[2]    All further date references occurred in 2022, unless otherwise specified.

kidnapped the children, as well as other documents expressing similar sentiments.[3]

At the February contested jurisdiction and disposition hearing, Father appeared by phone and again repeatedly interrupted the court and counsel. He expressed that he had never agreed to J.B.'s representation, "had to file paperwork on [his] own," and was representing himself. J.B. asked the court to relieve him as Father's counsel because he and Father had been unable to communicate, Father had refused to help J.B. in his defense, and Father had indicated a desire to represent himself by filing motions and other documents directly with the court. The court denied J.B.'s request, finding that Father's statements indicated he did not understand the law and was incapable of representing himself. After Father continued to interrupt the hearing, including interrupting closing arguments, the court muted his line. The court proceeded with the hearing and found the children's petitions true, removed them from Mother and Father's care, and placed them in a licensed foster home.[4]

Father continued to attend supervised visits with the children over the following months but frequently yelled and shouted at Agency staff. At one visit, a social worker had to physically prevent Father from leaving with Y.D. During another incident, Father followed one of the Agency's security guards

[3]    The juvenile court denied both section 388 petitions without a hearing because it had not yet made a jurisdictional finding.

[4]    Father previously appealed this order, contending only that the Agency did not comply with its inquiry duties under the federal Indian Child Welfare Act and section 224.2. We accepted the Agency's concession and stipulation for the immediate issuance of the remittitur, which issued on May 6, 2022. (*In re Y.D.* (May 6, 2022, D080004) [nonpub. opn.].)

by car onto the freeway and into a Walmart parking lot. Y.D.'s speech therapist also expressed concerns about working with Father due to his angry interactions with her. Meanwhile, Y.D.'s foster mother reported that after Father's visits, Y.D. had been clingier than usual, struggled to regulate her emotions, and had increasingly frequent and severe tantrums.

At a May special hearing, J.B. again asked to be relieved as Father's counsel, but the court denied his request. The court additionally held a *Marsden*[5] hearing and denied Father's *Marsden* motion.

In June, the Agency filed a section 388 petition asking to suspend Father's in-person visitation with the children because he had attempted to flee with them during a recent supervised visit. Security had retrieved the children just before Father crossed a busy street with them. In an addendum report, the Agency also reported that after a prior supervised visit, Father had walked to the staff building, yelled and shouted, and looked into office windows before security eventually intervened. Meanwhile, Father's domestic violence group terminated his services because of his "language," after he verbally "[went] after" a counselor.

During a June 3, 2022 hearing, J.B. renewed his request to be relieved as Father's counsel, contending that he was unable to communicate with Father as needed to effectively represent him. The juvenile court denied the request, noting that "absolute chaos" would ensue if Father was allowed to represent himself. Father—who appeared remotely—interrupted that the court would "pay for this," that the judge was "treasonous" and "should be hung at high noon," and to express that he wished to hire his "own attorney." The court told Father he was entitled to hire his own attorney. When Father again interrupted to call the judge "a fucking piece of shit," the court muted

---

[5] *People v. Marsden* (1970) 2 Cal.3d 118.

his line. The court continued the adjudication of the Agency's section 388 petition to allow time for Father to retain his own counsel, and it temporarily suspended Father's visitation until the continued hearing date. After the hearing, Father filed two additional section 388 petitions in pro per demanding the children's return.

At a hearing less than a week later, Mother[6] made her first appearance and was appointed counsel. The children's counsel asked the juvenile court to conduct a Guardian Ad Litem (GAL) inquiry with Father. The court conducted the inquiry and declined to appoint a GAL, finding that Father disagreed with the proceedings but understood them and chose not to work with J.B. When Father interjected that he was "firing" J.B, the court held another *Marsden* hearing and again denied Father's *Marsden* motion.

During later hearings in June, Father continued to interrupt court hearings. He also continued to file various documents in pro per, including a special hearing request, a petition for extraordinary writ, a notice of intent to file a writ petition, and court forms expressing his opinion about the case. At these hearings, J.B. reiterated his and Father's inability to communicate and renewed his requests to be relieved as Father's counsel, which the court denied. The same month, Father was arrested for causing a disturbance at the courthouse.

During a July hearing, Father repeatedly interrupted the court, lodged his own objections to evidence, and objected during closing arguments. He stated, "I don't want to be appointed any counsel because I don't believe that counsel is in my best interest," and expressed his belief that J.B. was not

---

6    Because Mother's contention on appeal is limited to joining Father's arguments regarding his lack of representation, we discuss her only as needed.

"representing" him in the proceedings but was instead "misrepresenting" him.  J.B., meanwhile, asked the court on Father's behalf to deny the Agency's section 388 petition and to deny the children's request for a restraining order against Father.  The juvenile court granted the section 388 petition, suspended in-person visitation between Father and the children, and granted the children's restraining order with the exception that Father could visit the children pursuant to juvenile court orders.

In August, the Agency re-referred Father to a domestic violence group.  After enrolling in early September, he was discharged from the group less than a week later with a recommendation that he address mental health and domestic violence individually with a domestic violence therapist.  The following month, both Mother and Father were briefly incarcerated after they tried to flee with the children.  Father was also charged with failing to register as a sex offender.

At a hearing in September, Father continued to interrupt the court and counsel, deny that J.B. represented him, lodge his own objections, and argue directly to the trial court.  The court terminated reunification services and set a section 366.26 hearing.  The following month, Father again filed various documents in pro per in which he objected to the initiation and continuation of the dependency proceedings.

Father interrupted the beginning of a January 2023 hearing to request a continuance from the court, stating that he was "going to be working with another attorney."  He told the court that J.B. "ha[d] requested four times to be relieved," and Father did not want J.B. "to represent [him] at all."  Although the court granted Father's request for a continuance, he repeatedly interrupted the remainder of the hearing to state, "You're all going to burn in hell for doing this to people," and to "pray to Christ all your hearts stop from

beating." The court told Father that if he hired his own attorney, the attorney could appear before the continued pretrial conference or on that date. Father nonetheless continued interrupting the hearing, including calling the court a "baby-napping piece of shit."

B

*Hearing At Which Father Was Relieved of Counsel*

At the February 8, 2023 pretrial conference, Father reiterated that he did not want J.B. to represent him, and J.B. renewed his request to be relieved as counsel, reporting that Father wished to represent himself. The court explained to Father his right to have an attorney specializing in dependency law, that J.B. specialized in dependency law, and that Father had the right to represent himself. Father clarified that he wanted counsel but did not want to be represented by J.B. J.B. reported that Father refused to communicate with him and that Father's only option was to represent himself. The court took judicial notice of the prior *Marsden* hearings during which it declined to relieve J.B. as Father's counsel, and it found that Father understood his rights. The court agreed to grant Father's request to relieve J.B. as counsel, stating:

> "[I]f you don't want [J.B.] to represent you, I can respect that and I will grant that request as long as you understand that one, you have the right to an attorney, you have the right to self-representation, you also have certain expectations by the Court if you do represent yourself, and that you are not going to get special treatment just because you're representing yourself. ¶ Do you understand that, and do you still want to . . . have [J.B.] relieved as your attorney, having had the Court advise you of those rights; yes or no? ¶ Do you want [J.B.] relieved?"

Father responded, "Yes," stating, "And I don't want special treatment . . ." The court then relieved J.B. as Father's counsel. The court overruled the children's counsel's objection to Father representing himself, and explained

the section 366.26 hearing trial procedures and processes to Father and the other parties. Father lodged objections and made additional statements to the court, after which the court set a deadline for the parties to file witness lists and other trial-related items.

## C

### *Dependency Proceedings After Father Was Relieved of Counsel*

The following week, Father—who was now representing himself—filed several additional documents with the court, including a notice of appeal, two section 388 petitions, a special hearing request, and a notice of intent to file a writ petition. On February 22, 2023, he filed a witness list, proof of service, special hearing request, letter to the California governor, letter from his support person, and documents showing his participation and completion of 52-hour and 16-hour domestic violence classes, among other filings.

At the March 3, 2023 contested section 366.26 hearing, Mother asked to continue the hearing because of her counsel's unavailability. The court granted the continuance over Father's objection. Throughout the hearing, Father interrupted the court to express his feelings about the case. He also told the court that he had repeatedly asked for an attorney other than J.B. The court responded that Father had asked to represent himself, and Father stated that he had requested different court-appointed counsel. The court then asked Father three separate times if he wanted counsel to be appointed, but Father either did not respond or stated that he did not want J.B. to represent him. The court told Father he could not "handpick" his attorney without hiring one himself.

## D

*Combined Section 388 and Section 366.26 Hearing*

At the March 6, 2023 continued contested section 366.26 hearing, the Agency asked the court to reappoint counsel for Father. The court asked Father twice if he wanted J.B.'s office reappointed to represent him. Father responded that he "would not mind representation" but did not want representation from J.B.'s office. The court found that Father had previously knowingly and intelligently waived his right to counsel, and it denied the Agency's request to reappoint counsel. The court also asked J.B., who was present at the section 366.26 hearing, to remain available until the hearing's conclusion should it become necessary to reappoint him.

The court proceeded with the hearing, and Father gave an opening statement. The juvenile court construed Father's February 2023 filings and the other documents he identified at the hearing—which included documentation showing his completion of and/or participation in various domestic violence and parenting classes—as a section 388 petition. After hearing argument, the court denied Father's section 388 petition for failure to make a prima facie showing.

The court next turned to the section 366.26 hearing. Over Father's objection, the court received into evidence several of the Agency's reports[7] and the social worker's curriculum vitae.

The Agency's section 366.26 report recommended that the juvenile court terminate parental rights and designate adoption as the children's

---

[7] These included the Agency's section 366.26 report, detention report, September 27, 2022 addendum report, and six-month review report.

permanent plan.[8] The social worker opined in the report that neither parent had a beneficial parent-child relationship with either child. Father's domestic violence challenges and mental health had impeded his ability to maintain a relationship with the children during the case. For example, after Father tried to flee with the children, a restraining order issued prohibiting further in-person visits. The report noted as another example that, at the beginning of a December 27, 2022 visit, Y.D. began crying and was inconsolable. When Father became frustrated and began accusing the Agency of kidnapping the children and being "evil," the Agency had to end his visit.

According to the Agency's report, the children's behavior at visits did not indicate any significant bond to Father. During Father's virtual visits between November 2022 and January 2023, Y.D. sometimes spoke to Father, showed him things, and called him "Dad," but more often than not, she moved or played away from the computer screen or turned her back to the screen. Y.D. had continued to have tantrums and emotional dysregulation after visits with Father, which lessened once visits became virtual rather than in-person. G.D., on the other hand, would generally play during visits without acknowledging Father. G.D. did not recognize Father as a friend or parent and transitioned to and from visits without any emotional response, either positive or negative.

The report further noted that Y.D. had been participating in weekly therapy since June and had met most of her treatment goals by January 2023. And both children looked to their caregivers for assistance,

---

8    The report also attached two documents on Father's behalf: a certificate of completion for a parenting program and a domestic violence court progress report, which reflected that he had completed 13 out of the 52 weeks of the program.

reassurance, and comfort.  The report also stated that the sibling exception to adoption did not apply because the children had never lived with or shared any common experiences with their six paternal half-siblings.

The court gave Father an opportunity to cross-examine the social worker—which he implicitly declined—and to present evidence.  Father also testified, answered the court's questions about the beneficial parent-child relationship exception and sibling exception to adoption, and gave a closing argument.

After hearing argument and evidence from the parties and conducting further inquiries with Father, the court found the children were generally and specifically adoptable.  The court emphasized the parents' ongoing domestic violence and turbulent contact with the Agency, which sometimes endangered the children.  It noted Y.D.'s emotional dysregulation after visits and lack of engagement with video visits.  The court acknowledged Father's emphasis at the hearing on Y.D.'s statement that she wanted to go home with him, but it found this was not sufficient evidence of a beneficial parent-child relationship on its own.

The court further found the children would not suffer detriment if parental rights were terminated and that the benefits of adoption outweighed the children's continued legal relationship with the parents.  It also found that the sibling exception to adoption did not apply, noting that there was no evidence of any shared common experiences between the children and their six paternal half-siblings.  The court then terminated parental rights and designated adoption as the children's permanent plan.  Father appealed.

III

DISCUSSION

Father contends the juvenile court erred by denying him appointed counsel. He asserts that he did not knowingly and intelligently waive counsel and that, even after being relieved of counsel, he repeatedly requested it. The Agency and children respond, and we agree, that Father knowingly and intelligently waived this right. Accordingly, there was no error. Moreover, even assuming error, we conclude it was harmless.

A

In dependency proceedings where a child has been placed in out-of-home care, an indigent parent has a statutory right to appointed counsel unless the court finds the parent has made "a knowing and intelligent waiver of counsel." (See § 317, subd. (b); *In re Al.J.* (2019) 44 Cal.App.5th 652, 668 (*Al.J.*). A knowing and intelligent waiver does not require a full *Faretta*-type[9] admonition and inquiry by the juvenile court, and "[a] parent may waive counsel at any point." (*In re Angel W.* (2001) 93 Cal.App.4th 1074, 1083, 1084 (*Angel W.*); see also *Janet O. v. Superior Court* (1996) 42 Cal.App.4th 1058, 1064 [construing section 317 to permit relieving counsel from appointment once parent no longer desires counsel].) At the same time, parents also have "a statutory right to self-representation in a proceeding to terminate parental rights." (*Angel W.*, at p. 1082; § 317, subd. (b).) Thus, "the court must respect the right of the parent to represent him- or herself as a matter of individual autonomy and avoid forcing the mentally competent parent to proceed with appointed counsel in the guise of protecting a person who is unskilled in the law and courtroom procedure." (*Angel W.*, at p. 1084.)

---

9      *Faretta v. California* (1975) 422 U.S. 806.

Here, we have little trouble concluding that Father knowingly and intelligently waived counsel.  At the February 8, 2023 hearing, he stated, "I don't want [J.B.] to represent me."  The court responded by explaining to Father his right to have an attorney specializing in dependency law, that J.B. specialized in dependency law, and that Father had the right to represent himself.  After further discussion, the court acknowledged that Father understood his rights and that he still wanted J.B. relieved as his attorney.  The court then repeated for Father the realities of self-representation, stating:

> "[I]f you don't want [J.B.] to represent you, I can respect that and I will grant that request as long as you understand that one, you have the right to an attorney, you have the right to self-representation, you also have certain expectations by the Court if you do represent yourself, and that you are not going to get special treatment just because you're representing yourself.  ¶ Do you understand that, and do you still want to . . . have [J.B.] relieved as your attorney, having had the Court advise you of those rights; yes or no?  Do you want [J.B.] relieved?"

Not only did Father respond, "Yes," but he also further confirmed his understanding that he was requesting to represent himself, stating, "And I don't want special treatment . . ."

Our examination of the remainder of the record, and particularly Father's conduct, only further confirms the validity of this waiver.  (See *People v. Fox* (2014) 224 Cal.App.4th 424, 428 ["On appeal, we independently examine the entire record to determine whether Fox's waiver of his right to counsel was valid."].)  Even before the court relieved Father of counsel at the February 8, 2023 hearing, he had demanded that J.B. be relieved numerous times at numerous hearings.  Indeed, as early as the February 9, 2022 hearing—only six weeks after J.B.'s appointment—Father expressed that he had never agreed to J.B.'s representation, "had to file paperwork on [his]

own," had "been doing so [him]self," and was representing himself. During hearings between June and September 2022, Father stated that he was "firing" J.B. and repeatedly stated that J.B. did not represent him and that Father represented himself. And during a July 2022 hearing, Father stated he did not "want to be appointed any counsel because [he] d[id]n't believe that counsel [wa]s in [his] best interest." Moreover, from the outset of the dependency proceedings and despite being represented, Father made countless filings in pro per, including filing various writs and section 388 petitions. And at nearly every hearing before he was relieved of counsel, Father argued directly to the court, often arguing the merits of his case, lodging his own objections, and requesting his own continuances.

We are unpersuaded by Father's additional contention that his conduct *after* the court relieved him of counsel invalidated this waiver. At the subsequent March 3, 2023 hearing, for example, Father complained that he wanted an attorney appointed but "not [J.B.]." The court responded that Father had previously requested self-representation and explained that if Father wanted an attorney appointed, the court would reappoint J.B. Yet, when the court expressly asked Father if he wanted an attorney appointed, "yes or no," Father responded, "Not [J.B.]." The court correctly explained that Father could not "handpick" his attorney unless he hired his own.

Again, at the March 6, 2023 contested section 366.26 and section 388 combined hearing, the court asked Father if he wanted J.B.'s office reappointed for the proceeding, "yes" or "no." Father responded that he "would not mind representation" but repeatedly voiced that he did not want J.B. or his office to represent him. Although the court asked J.B. to remain available until the hearing's conclusion should it become necessary to reappoint him, Father never re-invoked his right to counsel. Instead, he

proceeded with representing himself at the hearing, including offering and objecting to evidence, testifying on his own behalf, making opening and closing arguments, and answering the court's questions.

Father further contends that the juvenile court should have appointed him *different* counsel or ordered his appointed counsel, J.B., to continue to represent him. We again disagree on both points. First, Father does not allege that J.B. failed to adequately represent him. Nor does he challenge the court's prior *Marsden* findings denying his requests for new appointed counsel. Accordingly, on this record, he did not have a right to a second court-appointed attorney. (See *People v. Marsden* (1970) 2 Cal.3d 118, 123 [" 'A defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused.' "].) As the juvenile court aptly observed, court-appointed counsel "isn't a shopping spree" and Father could not "handpick whatever attorney [he] want[e]d," unless he hired his own attorney. (See *ibid*.)

Regardless, we are hard pressed to believe on this record that any attorney could have satisfied Father. The record is replete with evidence that, even from the outset of the dependency proceedings, Father refused to work with or communicate with J.B. and that he was wholly unwilling to assist J.B. in his defense. To the extent Father suggests that counsel should not have been relieved because Father's self-representation would unduly disrupt the dependency proceedings, the record shows the opposite—that Father was uncontrollable regardless of his representation status. Indeed, even while represented and despite the court's repeated warnings, Father nonetheless interrupted hearings to speak for himself, yelled and screamed

during hearings, cursed the court and parties with profanities and allegations of treason, argued that the presiding judge should be hung at high noon, and was arrested twice for his conduct at court. Thus, the court did not abuse its discretion by granting Father's request for self-representation. (Cf. *In re A.M.* (2008) 164 Cal.App.4th 914, 927–928 (*A.M.*) [court did not abuse discretion by denying parent's self-representation request where ample evidence showed that granting the request would unduly delay the dependency proceeding]; see also *Angel W.*, *supra*, 93 Cal.App.4th at p. 1085 ["The possibility of disruption or delay, however, exists to some degree with virtually all pro se litigants. . . . Only when the pro se litigant 'is and will remain' so disruptive as to significantly delay the proceedings or render them meaningless . . . may the court exercise its discretion to deny self-representation."].)

As to Father's position that the court erred by failing to order J.B. to continue representing Father against his wishes, he is incorrect for the same reasons discussed previously. Specifically, Father knowingly and intelligently waived his right to court-appointed counsel and invoked his right to self-representation.[10] Moreover, considering the juvenile court's request of J.B. to remain available during the full section 366.26 hearing, Father easily could have requested his reappointment at any time. Yet, he did not.

---

[10] Had the court ordered J.B. to continue representing Father despite Father's request, we suspect that Father would likely instead be contending that the court violated his right to self-representation. (See e.g., *A.M.*, *supra*, 164 Cal.App.4th 914 [reviewing juvenile court's decision to *deny* parent's request to self-represent]; *Angel W.*, *supra*, 93 Cal.App.4th 1074 [same].)

B

Even assuming there was a violation of Father's right to counsel, any error was harmless.[11] Tellingly, Father does not attempt to argue how his lack of representation prejudiced him. Nor does the record support such a conclusion.[12] As to Father's denied section 388 petition, the record does not show the requisite change in circumstances, despite Father's seeming contention that his participation in parenting and domestic violence classes should suffice. (See e.g., *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["substantial" change in circumstances required to warrant granting of § 388 petition]; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [petitioning parent must show change of circumstance and that proposed modification is in child's best interests].) Rather, the record shows that Father's violent and aggressive behavior only continued throughout the dependency proceedings.

---

[11] We reject Father's contention that the purported error here is structural and requires automatic reversal. In *In re Christopher L.* (2022) 12 Cal.5th 1063 (*Christopher L.*), our Supreme Court rejected the argument that denial of a parent's right to counsel constitutes per se reversible error. (*Id.* at p. 1069.) Instead, where—as is the case here—a court can engage in a prejudice analysis " 'responsibly' " and without relying on " 'inferences that really amount to guesswork,' " a harmless error inquiry is appropriate. (*Id.* at p. 1082.)

[12] The *Christopher L.* court declined to resolve whether, in performing a harmless error inquiry, we should apply the standard for state law error (see *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)) or the more stringent federal constitutional error standard (see *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)). (*Christopher L.*, *supra*, at p. 1083.) We need not resolve that question, however, because the record here permits us to conclude without "guesswork" that no prejudice resulted from Father's lack of representation—even under *Chapman*'s more stringent "harmless beyond a reasonable doubt" standard. (*Chapman*, at p. 24.)

As only a few examples of many, we observe that Father kidnapped and physically assaulted Mother in August 2022, repeatedly yelled and shouted during visits with the children and during court dependency proceedings at which he also directed profanities at the court, and lost his Agency-approved domestic violence services for verbally attacking a counselor.

Regarding the juvenile court's order terminating Father's parental rights, the record overwhelmingly shows that the children were adoptable and that neither the beneficial parent-child relationship exception[13] or sibling relationship exception[14] applied to preclude adoption. For example, Father does not explain how he could show a beneficial relationship existed where Y.D. generally avoided interacting with him during visits, G.D. did not even acknowledge him, and the children were not distressed or sad when Father's visits ended. Moreover, he does not identify any evidence that terminating parental rights would be detrimental to the children or that such detriment would outweigh the benefits of adoption. (See § 366.26, subd. (c)(1)(B)(i).) Thus, considering the facts from the Agency's reports—none of which Father contests—any additional evidence or argument made by an

---

[13] For the beneficial parent-child relationship exception to adoption to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) a beneficial parent-child relationship; and (3) that terminating the relationship would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

[14] Father admitted at the section 366.26 hearing that the children had never met their six paternal half-siblings, and the record shows the children had never lived with them or shared any common experiences with them. (Cf. § 366.26, subd. (c)(1)(B)(v) [sibling exception applies where court finds that interference with child's sibling relationship is "compelling reason" to conclude adoption would be detrimental to the child when considering nature and extent of sibling relationship].)

attorney at the section 366.26 hearing would not have produced a different outcome.  (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, italics added, disapproved on another ground by *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5 ["Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."].)

IV

DISPOSITION

The juvenile court's March 6, 2023 orders are affirmed.


McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


RUBIN, J.